DATATROL INC. *vs.* STATE PURCHASING AGENT & others.

Suffolk. October 5, 1979. — February 4, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*State Lottery Commission. Practice, Civil,* Parties. *Contract,* Bidding for contract. *Commonwealth,* Purchasing.

Where a contract award was set aside on the ground that it did not comply with the requirements of G. L. c. 7, § 22, the recipient of the award which was set aside had sufficient interest in the proceeding to justify its intervention as a party appellant. [689-691]

A bidder on a contract governed by G. L. c. 7, § 22, had standing to challenge the compliance of the awarding authority with the requirements of that section even though it twice bid on the specifications without protesting. [690]

The provisions of G. L. c. 7, § 22, were applicable to the award of a contract for a lottery computer system. [691-696]

The provisions of G. L. c. 7, § 22, were not inapplicable to the award of a lottery computer system on the ground that the contract as executed provided exclusively for operational services and not for purchase of tangible property where it appeared from the request for proposals that the contract could involve purchases of equipment and where the executed contract included a lease of equipment. [693-696]
A problem-oriented bid specification in a request for proposals did not comply with G. L. c. 7, § 22. [696-702]

CIVIL ACTION commenced in the Superior Court Department on October 13, 1978.

The case was heard by *Donelan*, J., a District Court judge sitting under statutory authority.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Paul A. Good*, Assistant Attorney General, for the defendants.

*John Silas Hopkins, III* (*John M. Harrington, Jr.*, with him) for American Totalisator Company, Inc., intervener.

*Charles F. Choate* (*Wm. Gerald McElroy, Jr.*, with him) for the plaintiff.

LIACOS, J. The State Lottery Commission (Lottery) awarded a contract for an on-line number selection processing system to American Totalisator Company, Inc. (AmTote), on September 27, 1978. Datatrol Inc. (Datatrol), a disappointed bidder, commenced this action on October 13, 1978, in the Superior Court for Suffolk County. Datatrol sought, inter alia, a preliminary injunction forbidding the Lottery, the executive director, chairman, and members of the Lottery, and the State Purchasing Agent (Agent) from entering a contract with AmTote for the computer system. On October 18, 1978, the request for an injunction was denied. However, on November 13, 1978, the plaintiff was allowed to amend the complaint by adding a request for a determination that the award to AmTote did not comply with the requirements of G. L. c. 7, § 22, and was therefore void.

After trial on the merits, a judge of the Superior Court entered judgment on February 28, 1979, setting aside the

award to AmTote. On March 8, 1979, the judgment was ordered amended to enjoin the Lottery and the other defendants from performing a contract executed pursuant to the award. The Lottery's motion for a stay of judgment was denied, and an amended judgment was entered on March 19, 1979.

On March 22, before the Lottery's appeal was docketed, AmTote moved in the Appeals Court to intervene as a party appellant and moved for a stay of the judgment. The Appeals Court single justice denied both motions on March 28. On April 26, after the Lottery's appeal was docketed, AmTote appealed the denial of the March 22 motion and renewed its motion to intervene. The single justice of the Appeals Court transferred the motion to the panel assigned to decide the appeal. AmTote's appeal was consolidated with the main appeal. We transferred the appeals here on our own motion.

Thus, the Lottery and AmTote appeal from the amended judgment of March 19. Furthermore, AmTote appeals from the denial of its motion to intervene, and AmTote's renewed motion to intervene is before us de novo. We grant AmTote's motion to intervene, and affirm the judgment of the Superior Court.

## I.

We state the relevant facts, as found by the trial judge. On May 19, 1978, the Lottery issued an Invitation to Bid and Request for Proposals (RFP) for a lottery computer system. This invitation described itself in the following terms. *"Purpose of Bid Request.* The purpose of this bid request is to solicit technical and cost proposals for the procurement of equipment and support services necessary for the implementation and operation of an *On-Line Number Selection Lottery Processing System.* Such a system would be utilized for operating the Massachusetts Lottery's current Numbers Game, the soon to be implemented Lotto Game and other planned number selection Lottery games to be offered in the

future. Further, this on-line system is to be operated in parallel with the Lottery's currently installed Off-Line Number Selection Lottery Processing System . . . ."

In outline, the system was described as consisting of at least 300 to 500 on-line betting terminals to be installed at sales agent locations throughout the Commonwealth, and a telephone communications system linking the terminals to a central computer, to be installed at Lottery headquarters in Braintree.[1] The system's principal function was to improve

---

[1] The system was described in somewhat greater detail in RFP par. 4:

"4.1 Approximately 300 to 500 on-line betting terminals to be installed at sales agent locations with the possibility of expansion up to 750 or 1,000 terminals or conceivably more, depending upon cost of the terminals, reliability of operation and effect on total revenue experienced from the installation of the initial quantity of terminals.

"4.2 Communications facilities necessary to on-line connect these sales agent betting terminals to control computers to be installed at the Massachusetts Lottery's Headquarters facility located in Braintree, Massachusetts. Such communications facilities to include modems at the terminal and central locations as well as the possible use of remote concentrators and/or front-end communication line control computers.

"4.3 Management information/claims handling terminals to enable Massachusetts Lottery officials to properly monitor the operation of the on-line betting system as a whole and to pay prizes at Lottery Headquarters for people who come in to claim their winnings directly.

"4.4 A fully duplexed computer system for the processing of betting information and control of the communications network connecting the on-line betting terminals installed at sales agent locations. Such equipment would handle the polling of terminals, receipt of bets, checking of bets, posting to pool totals, maintenance of agent betting and cashing totals, processing of winning tickets submitted for prize claim, printing of tickets, etc. The system will also be required to interface with the Lottery's IBM System/370 computers to allow for the merging of the on-line betting handle with that of the currently installed and operating off-line system.

"4.5 Depending on types of equipment recommended possible microprocessor firmware/software for controlling the operation of sales agent, management and claims handling terminals used in the system.

"4.6 Possible software for the central processing and communications control computer necessary to accomplish the system requirements outlined in Paragraph 12.2 of this specification.

"4.7 Possible equipment, software and total system installation support to include site planning/construction, equipment delivery, software checkout, communications facilities integration, personnel training, etc.

the efficiency of the daily numbers game.[2] The RFP sets out a description of the purposes of the system, the jobs it was supposed to do, and the support services to be furnished by the bidder. However, the RFP does not set out a description of many aspects of the system itself. Thomas Bryan O'Heir, the deputy director of the Lottery for planning and development and the author of the RFP, characterized the RFP as a "problem oriented bid specification." It stated a general problem to be solved. The bidders were to supply the specifications of a system that would solve the

"4.8 Possible equipment maintenance of central computer, communications and/or terminal equipment or providing sufficient training documentation and spare parts to allow Massachusetts Lottery engineers to perform this function.

"4.9 Possible maintenance of central computer and betting terminal software/firmware or alternately providing necessary training and documentation which would allow the Lottery's own systems and programming function to do this.

"4.10 Possible system operation support wherein vendor personnel would actually operate the system for the Lottery on a fee basis or alternately providing training and operation manuals/documentation which would allow the Lottery to operate the system utilizing its own computer operations staff."

[2] The advantages of an on-line system have been ably described in defendant AmTote's brief: "The daily numbers game now operated by the Lottery is an 'off-line' game, i.e., the various sales agent locations are not tied into the central computer processing system that processes betting slips, calculates payoffs and prepares lists of winners. Instead, betting slips must be picked up physically from each sales agent location and carried by courier to the Lottery's headquarters in Braintree for processing. The result is a substantial delay between the time wagering is closed and the number selected and the time the payoff is calculated and winning tickets paid. . . .

"In an 'on-line' system each sales agent location has a computer terminal that is tied by telephone lines directly into the central computer. Wagers are entered through each terminal directly into the central processing system, either by keyboard entry or by automatic reading of bettor-marked cards; and an instruction is transmitted back to the terminal to cause the printing of a ticket that serves as a receipt for the bet. . . . When a system is completely on-line betting can be terminated, a number drawn five minutes later, and the system back on line both to take bets for the next day and to pay winning tickets another five minutes later. . . . The Lottery forecast that changing from an off-line system to an on-line system would increase the amount wagered each week by about $1,000,000."

problem. The judge identified fourteen areas in which the specifications were left open. "(a) The type of business arrangement desired by the Commission. . . . [T]he [RFP (at par. 14.11)] sets forth five types of business arrangements which are 'possible under this procurement': Facility Management Proposals; Turn-Key System Proposals; System Equipment Proposals; Specific Equipment Proposals; and Software/System Implementation Proposals. . . .[3]

[3] Possible arrangements were described in RFP par. 5:

"5.1 *Facility Management Proposals* — This would involve an arrangement whereby all equipment, software and support necessary to install, checkout and actually operate the On-Line Number Selection Lottery Processing System would be provided on either a fixed monthly lease basis or alternately on a percent of handle cost basis.

"5.2 *Turn-Key System Proposals* — This would involve furnishing all equipment, software and support required to install, start-up and shakedown the system. After checkout and acceptance test running, actual operation would be assumed by Massachusetts State Lottery personnel. For equipment and software maintenance, the Lottery will consider the two options of having this supplied by the vendor or alternatively having the vendor furnish sufficient training, documentation and spare parts to allow the Lottery to perform these functions on its own. In any event, the system would be provided on either a purchase or monthly lease cost basis.

"5.3 *System Equipment Proposals* — This would involve furnishing only the equipment required for the system on a monthly lease or purchase cost basis. Possibly, certain software packages might also be offered. Also included would be the option of providing equipment maintenance or alternatively training, spare parts and documentation to allow the Lottery to perform its own equipment maintenance. Software under this type of business arrangement would either be procured separately or alternatively be developed by the Lottery's own systems and programming staff.

"5.4 *Specific Equipment Proposals* — This would involve supplying specific items of equipment required for the total system but not all items. Included in this type of proposal would be furnishing only the central computer equipment or only the betting terminals. Presumably, this type of proposal would allow the Lottery to configure its own system equipment, selecting, for example, central control computers from one supplier and betting terminals from another, etc. Included as part of supplying equipment would be the option of furnishing equipment maintenance or alternatively performing its own maintenance. In this case, equipment would be procured on either a lease or purchase basis. Software would either be obtained separately from an outside source or developed internally by the Lottery's own staff.

"(b) The delivery or completion date for the system . . . .

"(c) The number of computer terminals per telephone circuit. This number is significant because the fewer telephones per circuit, the more circuits required and the greater is the communications cost of operation. . . .

"(d) The number of characters to be on the keyboard of the terminal. The number selected by the bidder could be from twenty to one hundred and twenty. The number of characters would be a factor in cost, ease of operation, maintenance required and operational capability.

"(e) The numbers of characters to be on the display panel.

"(f) The ticket format and whether multi-bet or single-bet tickets should be used; if several bets could be entered on one ticket, this would obviously lower transaction time and the cost of ticket stock.

"(g) The maximum average transaction time for the system. The Invitation to Bid emphasizes the importance of this feature. It could vary widely depending on the equipment used. More expensive and more complex equipment could be used to achieve a lower transaction time, in the process increasing the cost of maintenance.

"(h) A maximum cost for the system proposed.

"(i) The overall design of the software system required.

"(j) The specific complement of equipment required at the central computer location.

"(k) Whether it was desirable or undesirable that a supplier use subcontractors. . . .

---

"5.5 *Software/System Implementation Proposals* — This type of proposal would involve furnishing software for either or both the terminal microprocessors and/or the central processing and communications control computers or assisting the Lottery's own staff in developing this. Included would be the design of the software, the actual computer programs and system checkout of not only individual components but also the operation of the entire system. All equipment would be procured by the Lottery separately. After acceptance test running, training would have to be provided to allow the Lottery to operate the system and to maintain the software supplied. The Lottery would procure this software on a one time purchase cost basis."

"(l) Whether an encryption system was desirable and the type of system to be used.

"(m) The optical mark reader is a very recent advance in computer technology which permits the bettor to write the terms of his bet on a special card which the machine can read and transmit to lottery headquarters.

"(n) The bidders were requested to specify in addition 63 additional characteristics of the terminal proposed — see par. 12.6 of the Invitation to Bid" (footnote added).

The judge found that it was feasible for the Lottery to have filled in all of the foregoing open specifications, and we agree.

The RFP stated that bidders' proposals would be evaluated according to eighteen criteria,[4] subject to a proviso:

---

[4] "13.37.1 Conformance to the specifications outlined in this Invitation to Bid and Request for Proposals.

"13.37.2 Overall cost of the system and equipment proposed and the degree to which it is competitive with other supplier proposals.

"13.37.3 Delivery schedules for the system/equipment proposed and the quoted starting date for system operation.

"13.37.4 Firm reputation, financial stability, depth of resources, experience in computer and on-line wagering systems and the extent of its company commitment to the support of this business.

"13.37.5 Operating status of all equipment proposed.

"13.37.6 The extent to which the equipment proposed is in field use and is not simply in design or prototype stages.

"13.37.7 Operating reliability of the system proposed including provisions for back-up and recovery in the event of failure.

"13.37.8 Compatability of the system proposed with the Lottery's currently operating off-line Numbers Game system.

"13.37.9 System flexibility and expansion in that the system proposed allows for the operation of Numbers, the Weekly Game and the Lotto Game and the potential exists with relative ease for expanding the system to other forms of wagering.

"13.37.10 Software proposed for the central computer processing and communications control function is in operation and needs only to be modified or that insurance can be given that newly developed software can be in operation safely before scheduled start date.

"13.37.11 Sales agent betting terminal proposed has high operating reliability, meets functional requirements established by the Lottery and is easy to operate and has flexibility for expansion.

"13.37.12 System recommended contains the necessary safeguards so that it may not be compromised by the public, sales agents or internally by Lottery or vendor employees.

"For purposes of bidding vendors may assume that equal weighting will be applied to all factors listed. The Lottery however reserves the right to assign any weight to whatever criteria it has listed in order to arrive at an award decision which best satisfies the requirements of this specification and the Lottery's long term best interests."

In keeping with this loosely constrained procedure, the RFP further stated: "It is to be understood that awards will be made to successful vendors based upon the criteria listed above. This may not result necessarily in an award to the lowest bidder although, clearly, where all other elements are equal, this will be the deciding factor." [5]

The RFP required submission of proposals by Friday, June 30, 1978, at 2 P.M. Several companies, including Datatrol, met the 2 P.M. deadline. AmTote requested from the Agent and received a two-hour extension over the plaintiff's protest. AmTote filed its bid at 3:45 P.M. After June 30, O'Heir submitted a letter to Dr. William E. Perrault, executive director of the Lottery, evaluating the bids and expressing a preference for AmTote. On July 3, the Agent disqualified AmTote. The Lottery rejected all bids and on August 23, 1978, announced a rebid on the original RFP. Of six companies to submit bids by the September 8, 1978, deadline, O'Heir chose three "finalists" including AmTote

"13.37.13 System proposed allows for the substantial expansion in volume and processing of other forms of wagering.

"13.37.14 Average time for processing individual betting transactions is extremely low when compared to other systems proposed.

"13.37.15 System proposed has high throughput level for the processing of transactions during peak periods of betting when compared to other systems proposed.

"13.37.16 System proposed results in a minimum cost for communications facilities when compared to other competitive systems.

"13.37.17 Support to be provided in installation of hardware and software, maintenance training, documentation, etc., is of high quality.

"13.37.18 Confidence on the part of the Massachusetts Lottery that the supplier can deliver what he has proposed on schedule."

[5] According to the judge, the combination of open specifications and the statement in the RFP that the Lottery could assign various weights to the eighteen evaluation criteria freed the Lottery "to select any bidder it desired without reference to specific detailed guidelines."

and Datatrol.[6] In a written analysis of these bids, he recommended that AmTote's proposal be accepted. Perrault, the Agent, and the Lottery approved the award for AmTote and the award was made on September 27, 1978. During the course of the instant litigation, the Lottery and AmTote proceeded to negotiate a contract which they executed on February 16, 1979.[7]

In his decision of February 28, 1979, the judge ruled that G. L. c. 7, § 22, the general procurement statute, applies to the award of a lottery computer system. He ruled that problem-oriented bidding "is not absolutely prohibited by Mass. [*sic*] law but, . . . it is a bidding process which must undergo a 'most careful scrutiny' to determine whether its use in the circumstances of this award has thwarted the object of the competitive bidding statute to ensure genuine competition and avoid favoritism, and whether . . . the plans and specifications state the quantity and quality of the work with as much certainty and definiteness as may be practicable." The judge found that the extension for AmTote in the first round of bidding was an act of favoritism. He remarked that "[w]ith the bids opened and analyzed, I am unable to see what legitimate purpose was served by the use of problem solving in the second round of bidding." Thus, the Lottery bore "a heavy burden to dispel the taint of favoritism which now surrounded the letting of the contract,"[8] and it was "essential" that the specifications be made definite in the second RFP. The judge further ruled the Lottery's failure to have definite specifications thwarted genuine and open competition. Despite the Lottery's good faith in choosing AmTote, "the bidding process was fatally

---

[6] The other three bidders were excluded because their proposals did not provide for a facilities management arrangement. See note 3, *supra*.

[7] The contract provides for a facilities management arrangement for one year with the option to extend the arrangement for four years in one-year increments, the option of entering into a turnkey full-payout lease and the option of outright purchase of the equipment.

[8] Although the judge found "favoritism," he specifically found no bad faith to be involved.

flawed." Furthermore, the use of problem-oriented specifications prevented the Lottery from properly applying the preference for Massachusetts goods in G. L. c. 7, § 22 (17). The judge concluded that the award to AmTote is void and should be set aside because it does not comply with G. L. c. 7, § 22.. On March 8, 1979, he found that on February 16, 1979, the Lottery and AmTote had executed a contract pursuant to the award, and he ruled that the contract should be set aside.

The Lottery argues that G. L. c. 7, § 22, and the regulations in 802 Code Mass. Regs. 2.00 (1978), promulgated thereunder, do not apply to the procurement of a highly sophisticated electronic data processing system. The Lottery also claims that, even if the statute and regulations apply, the RFP met the requirements. The Lottery argues that the judge erroneously substituted his judgment for that of the Lottery and based his conclusions on findings and evidentiary rulings which were clearly erroneous.

AmTote argues that it should be permitted to intervene, and that the RFP met all legal requirements. According to AmTote, the injunction forbidding the Lottery and AmTote from performing their contract was too broad; to the extent that the contract was for services, it was beyond the scope of G. L. c. 7, § 22. Finally, AmTote asserts that Datatrol lacks standing to attack the specifications.

## II.

We first consider two preliminary issues: AmTote's motion to intervene in these proceedings and the question of Datatrol's standing to sue. When the single justice of the Appeals Court transferred the motion to intervene to a panel of the Appeals Court under Mass. R. Civ. P. 24 (a) (2) and 24 (b) (2), 365 Mass. 769-770 (1974), he transferred his jurisdiction to rule on that motion. See also Mass. R. Civ. P. 21, 365 Mass. 767 (1974). Our transfer of the appeals to this court brings the motion before us. We allow the motion under rule 24 (b) (2). As the recipient of the award

which was set aside below, AmTote has sufficient interest in the proceeding to justify its intervention. Common questions of law and fact abound, and there is no assertion that the intervention "will unduly delay or prejudice the adjudication of the rights of the original parties." Mass. R. Civ. P. 24 (b) (2).[9]

AmTote argues that Datatrol lacks standing to challenge the validity of the Lottery's bid specifications. According to AmTote, a would-be contractor has no standing to attack an award if his attack negates the awarding authority's right to award the contract to anyone; only if he has a possibility of being awarded the contract under the challenged procurement does he have standing. Furthermore, AmTote argues that Datatrol twice bid on the problem-oriented specifications without protesting; Datatrol cannot be heard to protest only after it has lost the award.

Assuming arguendo that AmTote may attack Datatrol's standing at this juncture, we nevertheless find neither of AmTote's arguments persuasive. A bidder on a contract governed by G. L. c. 7, § 22, has standing to challenge the compliance of the awarding authority with the requirements of that section. Cf. *Interstate Eng'r Corp.* v. *Fitchburg,* 367 Mass. 751, 755-756 n.6 (1975); *Industrial Eng'r & Metal Fabricators, Inc.* v. *Poorvu Constr. Co.,* 354 Mass. 287, 290 (1968); *Quincy Ornamental Iron Works, Inc.* v. *Findlen,* 353 Mass. 85, 87-88 (1967). But cf. *Sweezey* v. *Mayor of Malden,* 273 Mass. 536 (1931) (statutorily authorized taxpayer suit).

AmTote's estoppel argument is mistaken in principle.[10] The Lottery in this case is no private party unfairly induced to change its position in reliance on Datatrol's silence. No

[9] In fact, at oral argument before us, counsel for Datatrol stated that he had no objection to AmTote's intervention. He objected only to AmTote's attack on Datatrol's standing.

[10] AmTote has found no Massachusetts authority on point. AmTote's attempt to find an analogous principle in *John D. Ahern Co.* v. *Acton-Boxborough Regional School Dist.,* 340 Mass. 355, 359 (1960), rests upon dicta.

substantial change of position has occurred. In addition, the Lottery as a public agency has a duty to award contracts in accord with law. The purposes of competitive bidding go beyond economy and efficient administration to the prevention of favoritism in the awarding of government contracts. See, e.g., *Morse* v. *Boston*, 253 Mass. 247, 252 (1925). Erecting a technical theory of estoppel as a bar to suits by disappointed bidders will not further that purpose.

## III.

The central question before us is the applicability of G. L. c. 7, § 22, to the award of a contract for a lottery computer system.[11] If the statute applies, we must decide

---

[11] General Laws c. 7, § 22, as amended through St. 1972, c. 248, §§ 1-5, provides, in part: "The commissioner of administration shall, subject to the approval of the governor and council, make rules, regulations and orders which shall regulate and govern the manner and method of the purchasing, delivering and handling of, and the contracting for, supplies, equipment and other property for the various state departments, offices and commissions, except when they are for legislative or military purposes. Such rules, regulations and orders shall be of general or limited application, and shall, so far as practicable, be uniform, shall be in conformity with existing laws relative to the purchase of articles and materials made by inmates of penal institutions and articles and supplies made by the blind except that such purchase shall be made by or under the direction of the state purchasing agent subject, however, to such approval by the commissioner as would be required if the purchase were made from some other source, and shall include provision for the following:

"(1) The advertisement for and the receipt of bids for supplies and other property and the stimulation of competition with regard thereto;

"(2) The purchase of supplies and other property without advertisement or the receipt of bids, where the amount involved will not exceed five hundred dollars, when, in the judgment of the state purchasing agent, it is expedient;

"(3) The purchase of supplies and other property without competition, in cases of emergency requiring immediate action;

"(4) The purchasing of or contracting for certain supplies, equipment and other property by long or short term contracts, or by purchases or contracts made at certain seasons of the year, or by blanket contracts or orders covering the requirements of one or more departments, offices and commissions;

whether the Lottery's problem-oriented specifications satisfy the statute.   The Lottery argues that the contract in-

"(5) Prescribing the times for submitting estimates for various supplies, equipment and other property;

"(6) Regulations to secure the prompt delivery of commissary and other necessary supplies;

"(7) Standardization of forms for estimates, orders and contracts;

"(8) Standardization of specifications for purchasing supplies, equipment and other property;

"(9) Standardization of quality, grades and brands to eliminate unnecessary number of commodities or of grades or brands of the same commodity;

"(10) The purchase of supplies and other property locally, upon permission, specific or otherwise, of the state purchasing agent;

"  . . . .

"(14) The testing of commodities or supplies or samples thereof;

"(15) Hearings on complaints in respect to the quality, grade or brand of commodities or supplies;

"  . . . .

"(17) A preference in the purchase of supplies and materials, other considerations being equal, in favor, first, of supplies and materials manufactured and sold within the commonwealth . . . .

"  . . . .

"Rules, regulations and orders made under this section shall not restrict otherwise than as provided in this section the several state departments, offices and commissions as to the quantity of supplies, equipment or other property which may be purchased or contracted for, for them, or as to the nature thereof.

"A copy of the rules, regulations and orders issued under this section and at the time being in force shall be delivered or mailed to any person on request, and the commission shall annually give public notice by advertisement inviting such requests and inviting all persons who desire to bid on state supplies, materials or contracts so to signify in writing by sending their names and addresses to the office of the commission with a statement of the class or classes of supplies, materials or contracts on which they desire opportunity to bid.   The state purchasing agent, under the direction of the commission, shall maintain a classified list of all persons so signifying such desire and shall make such use of the same for the stimulation of competition as shall be provided by said rules and regulations, having in view the time of delivery, the quantity required, the locality in which delivery is to be made, and any other special circumstances of the case.

"For the information of the public and of prospective bidders, the state purchasing agent shall keep and maintain a public list or bulletin enumerating the supplies and materials to be purchased or contracted for and the dates on which bids for the same will be received.

"Bids shall be opened in public."

volves sophisticated electronic equipment in a rapidly changing industry and that the Legislature, which enacted the statute in 1922, could not have contemplated such a contract. The Lottery's argument continues that a reading of the statute as a whole, and of the regulations, 802 Code Mass. Regs. 2.00 (1978), reveals that the statute deals with personal property that can be standardized. Furthermore, in G. L. c. 29, § 27B, inserted by St. 1973, c. 1230, § 6, the Legislature specifically provided for "rules and regulations governing the lease or purchase of data processing . . . equipment or systems." Although G. L. c. 29, § 27B, does not apply to the State Treasurer's department and the Lottery, the Lottery claims that the statute reflects a legislative belief that G. L. c. 7, § 22, does not pertain to purchases of data processing equipment.

AmTote argues that G. L. c. 7, § 22, does not apply to contracts for services. It claims the contract actually executed by AmTote and the Lottery provides exclusively for operational services, not for purchase of tangible property. Therefore, AmTote concludes that the judge could only enjoin the Lottery from entering a contract for the purchase of equipment; the injunction that actually issued was overbroad.

## A.

We reject both defendants' arguments. General Laws c. 7, § 22, authorizes the Commissioner of Administration to "make rules, regulations and orders which shall regulate and govern the manner and method of the purchasing, delivering and handling of, and the contracting for, supplies, equipment and other property." Section 22 (1) states that the regulations shall provide for "[t]he advertisement for and the receipt of bids for supplies and other property and the stimulation of competition with regard thereto." The regulation, 802 Code Mass. Regs 2.00 (6) (1978), states: "No supplies, material or other property shall be purchased or contracted for without competition . . . ."

The statute uses a panoply of terms that refer to tangible personal property: "supplies," "equipment," "commodities," "materials," "articles." It also includes the catch-all, "other property." This language is evidence of legislative intent to sweep broadly and encompass property not known in 1922. Cf. Rep. A.G., Pub. Doc. No. 12, at 150-151 (1975) (microfilm copies of public records are "other property"). See also Rep. A.G., Pub. Doc. No. 12, at 135-136 (1963). Although the Lottery is correct to identify standardization of purchasing practices and equipment as a goal of G. L. c. 7, § 22, the statute's broader purposes reach beyond regulating procurements of common fungible goods.[12]

The legislative history of G. L. c. 7, § 22, supports this reading. The statute was drafted in 1922 by a Commission on State Administration and Expenditures, and the language relevant to this case appeared in the earliest draft. The commission recommended, "[t]hat a central purchasing agency be established to take responsibility for *all State purchasing*, to standardize departmental requirements, and to make blanket purchases where practicable" (emphasis supplied). Report on State Administration and Expenditures submitted to the General Court by the Commission on State Administration and Expenditures, 1922 House Doc. No. 800 at 12. The commission did not link the coverage of the statute to the desirability of making blanket purchases of fungible goods. There is no indication that the commission contemplated any limit on coverage.

The Lottery's argument based on G. L. c. 29, § 27B, is also incorrect. The Lottery argues that G. L. c. 29, § 27B, is evidence of a legislative belief that all procurements of data processing systems, including those to which G. L. c. 29, § 27B, does not apply, fall outside the ambit of G. L. c. 7, § 22. In G. L. c. 29, § 27B, we find a legislative pur-

---

[12] There is one limit on the competition requirement as it applies to fungible goods. The regulation, 802 Code Mass. Regs. 2.00 (6) (1978), creates an exception to the competition requirement for "certain supplies, machinery and equipment for which there is no reasonable substitute." No one contends that the computer system falls within this exception.

pose to establish competitive procedures for procurement of some data processing systems. See 801 Code Mass. Regs. 5.00 (1978). It does not follow that departments exempt from those specific procedures may procure systems without competition. When the Legislature enacted G. L. c. 29, § 27B, it was presumptively aware of the general procurements statute, G. L. c. 7, § 22. See *Hadley* v. *Amherst*, 372 Mass. 46, 51 (1977). However, even if we were to assume that recent legislation might be useful in interpreting a much earlier enactment, nothing in the language or legislative history of G. L. c. 29, § 27B, supports the Lottery's view.

### B.

AmTote's argument that the injunction issued below is overbroad because G. L. c. 7, § 22, does not apply to service contracts is faulty in two respects. First, it implies that the applicability of G. L. c. 7, § 22, is to be determined by the character of the contract executed after competitive bidding. In fact, the character of the RFP determines the applicability of the statute. If the statute applies and has been violated, the contract awarded is void. *Grande & Son* v. *School Hous. Comm. of N. Reading*, 334 Mass. 252, 259 (1956). *Sweezey* v. *Mayor of Malden*, 273 Mass. 536, 542 (1931). If it appears from the RFP that the contract eventually executed might be covered by the statute, the statutory requirements control. Here the possibility that the contract could involve purchases of equipment makes G. L. c. 7, § 22, applicable.[13]

Second, the contract executed here is not exempt from G. L. c. 7, § 22. The statute applies not only to purchases, but also to "the contracting for . . . equipment." We believe that a contract for equipment includes a lease. Otherwise, the departments could use long-term leases to evade

---

[13] See notes 1 & 3, *supra*.

the competitive bidding requirement. Furthermore, although the contract provides for operating and maintenance services, those services are incidental to the procurement of equipment and software. The Lottery has never treated those services separately from the equipment. We do not believe they should be severed now.[14] Also, under the contract, the Lottery can choose eventually to purchase the equipment.

## IV.

Having determined that G. L. c. 7, § 22, applies, we must decide whether the statute permits problem-oriented bid specifications. The purpose of competitive bidding statutes is "to establish genuine and open competition after due public advertisement in the letting of contracts for . . . [public] work, to prevent favoritism in awarding such contracts and to secure honest methods of letting contracts in the public interests." *Morse* v. *Boston,* 253 Mass. 247, 252

---

[14] AmTote argues that "statutory competitive bidding requirements that do not expressly cover contracts for services are construed to be inapplicable to service contracts, even if those contracts are preliminary or incident to other contemplated or existing procurements that are subject to competitive bidding. E.g., *Rollins* v. *Salem,* 251 Mass. 468, 471 (1925)." AmTote further contends that the organic statute governing lottery operations supports the distinction between a contract for equipment and a contract for services. General Laws c. 10, § 25 (*b*), discusses "costs incurred in the operation and administration of the lottery." Section 25 (*b*) lists both contracts for "operational services" and those "for the purchase or lease of lottery equipment."

AmTote's first argument states a version of a widely recognized exception from competitive bidding requirements. The award of a contract for personal services, especially those of an expert consultant, need not comply with competitive bidding rules. See generally, Annot., 15 A.L.R.3d 733 (1967). We do not take issue with AmTote's distinction between contracts for services and contracts for equipment. In fact, had the Lottery wanted to hire a consultant for help in designing the on-line system, competitive bidding on that contract would not have been necessary. The error in AmTote's formulation is that contracts for services can be incident to procurements subject to competitive bidding, and the two can be so intertwined that competitive bidding is necessary on the whole "package." That was the situation here.

(1925). Accord, *Pacella* v. *Metropolitan Dist. Comm'n,* 339 Mass. 338, 342 (1959); *Sweezey* v. *Mayor of Malden, supra* at 540; *Burt* v. *Municipal Council of Taunton,* 275 Mass. 535, 542 (1931). "The . . . specifications must state the quantity and quality of the work required with as much certainty and definiteness as may be practicable. Every bidder must be able to know what materials are to be furnished and what work is to be performed in order to comply with the contract." *Sweezey, supra.* In *Sweezey,* the city of Malden sought bids on a contract for furnishing and laying pavement on a street. The specifications stated the thickness of the layer of pavement, but not the composition or manner of laying the wearing surface. The court sustained an attack on these open specifications: "To permit each bidder to furnish his own specifications for the construction of the wearing surface might, and probably would, allow a substantial variance in the manner of construction and its cost. Such a method of bidding would not result in bids being submitted on any common basis. Where, as here, each bidder is invited to bid upon his own specifications, it is plain that there can be no real competition between such bidders. Such an advertisement not only destroys competition, but gives city officials an opportunity to exercise favoritism in awarding contracts. A compliance with the ordinances makes it mandatory that prospective bidders shall stand upon an equal footing and that no one shall be permitted to submit his bid upon a basis different from that of any other bidder. To allow a bidder to furnish his own specifications for any material part of the contract in question would destroy genuine and fair competition and be subversive of the public interests." *Id.* at 542. See *Burt* v. *Municipal Council of Taunton,* 275 Mass. 535, 543 (1931) (alternative ground of decision). See generally 10 E. McQuillin, Municipal Corporations §§ 29.52, 29.53, 29.56 (3d ed. 1966). The *Sweezey* rationale is entirely applicable to the Lottery's problem-oriented specifications.

The Lottery and AmTote, however, argue that G. L. c. 7, § 22, differs from the ordinance in *Sweezey.* AmTote

claims G. L. c. 7, § 22, does not require specifications at all. Furthermore, the statute does not mandate that contracts be awarded to the lowest responsible bidder, and AmTote contends that the requirement of definite specifications should apply only to statutes including a low bidder requirement. Finally, AmTote argues that the prohibition of open parameter bidding has undesirable practical and legal consequences and that public procurements are peculiarly unsuited to "judicial legislation."

The defendants are correct that G. L. c. 7, § 22, does not expressly require the departments to use detailed specifications and does not contain a low bidder requirement.[15] The regulations do, however, require a statement of the "quantity and quality of the item . . . to be furnished." 802 Code Mass. Regs. 2.00 (4) (1978). This statement must inform the bidders of the character of the contract to be awarded, so that their bids conform to the needs of the department.

___

[15] We need not decide whether the statute impliedly contains a low bidder requirement. However, "[i]n the absence of the not unusual provision requiring contracts to be awarded to the lowest responsible bidder such a requirement is not to be implied, but it is to be inferred that the awarding of contracts is left to the reasonable judgment of the municipal officers charged with responsibility therefor." *Archambault* v. *Mayor of Lowell,* 278 Mass. 327, 332 (1932). Accord, *Gosselin's Dairy, Inc.* v. *School Comm. of Holyoke,* 348 Mass. 793 (1965); *Marinucci Bros. & Co.* v. *Metropolitan Dist. Comm'n,* 346 Mass. 763 (1963); *Deary* v. *Dudley,* 343 Mass. 192, 193-194 (1961); *Slocum* v. *Medford,* 302 Mass. 251, 254 (1939); *Larkin* v. *County Comm'rs of Middlesex,* 274 Mass. 437, 439 (1931).

We note that the State Purchasing Agent's manual for purchases under G. L. c. 7, § 22, states: "The Commonwealth will make an award based upon the lowest bid by a responsible bidder." Purchasing Agent's Division, General Procedure and Information for Bidders 2. However, a later passage in the manual states that the award will be made to the lowest and "best bid, considering price, quality of article to be supplied, and satisfactory to requirements of the Commonwealth." *Id.* at 3. We need not consider the meaning of this language nor whether the Agent can inject a low bidder requirement that is not explicit in the statute. Similarly, in its RFP, the Lottery stated that it would award the contract to the lowest bidder "where all other elements are equal." We need not decide whether the Lottery could commit itself in the RFP to award a contract to the lowest bidder and then refuse to do so.

The statement must also be specific in order to ensure that the department can evaluate all of the bidders on a common footing. Cf. *Detroit* v. *Hosmer,* 79 Mich. 384, 388 (1890). The description need not label the item by a specific brand nor define it so rigidly that only one thing can comply. See 802 Code Mass. Regs. 2.00 (6) (1978). A determination that increased specificity is feasible is not necessarily fatal to the specification. However, the item to be purchased should be described with enough precision to permit fair comparison among the several bids. This is the principle stated in *Sweezey, supra* at 540: "The . . . specifications must state the quantity and quality of the [items] required with as much certainty and definiteness as may be practicable."

Contrary to AmTote's assertion, the requirement of a common footing is not dependent upon a statutory low bidder requirement. Thus, in construing a statute that did not expressly require competitive bidding, detailed specifications, or award to the lowest bidder, we nevertheless held: "The statute here in question required open competitive bidding upon a common footing after a proper advertisement. It insures full publicity as to the contract and conduces toward the guarding of the public welfare." *Larkin* v. *County Comm'rs of Middlesex,* 274 Mass. 437, 439 (1931).[16] See *Archambault* v. *Mayor of Lowell,* 278 Mass. 327, 332-333 (1932).

---

[16] Statutes governing the award of contracts in this Commonwealth are so various as to provide scant guidance in the construction of G. L. c. 7, § 22. For example, some statutes speak of "competition," "competitive bidding" or "competitive bids" and expressly require both detailed specifications and award to the low bidder. E.g., G. L. c. 30, § 39M; G. L. c. 149, §§ 44A, 44C. Cf. G. L. c. 71, § 7A (if school bus contract is not awarded to lowest bidder, written justification necessary). A second class of statutes, including G. L. c. 7, § 22, refers to "competition" but does not expressly require either detailed specifications or award to the low bidder. A third class of statutes expressly requires public advertisement for proposals and public opening of bids submitted, but little more. E.g., G. L. c. 34, § 17; G. L. c. 40, § 4B; G. L. c. 164, § 56D. But cf. G. L. c. 29, § 8A ("competitive bidding" in title of section, but omitted from body). *Larkin, supra,* construed G. L. c. 34, § 17, a statute in the latter category.

AmTote argues that the rationale of the common footing requirement is to make possible a mathematically precise comparison based on price. When the awarding authority can consider factors other than price, it should be permitted to state its evaluation criteria and its needs and to request competition on all of the criteria. This argument, however, diverts attention from the true problem: as the evaluation criteria multiply and the specifications become more vague, the comparison between the bids becomes progressively harder and less meaningful. The point of the common footing requirement is not to ensure such definite specifications that all bidders are bidding on exactly the same thing. The requirement is designed to ensure meaningful, manageable comparison. As Datatrol correctly points out, the need for definiteness may even increase when criteria other than price come into play and awards based on favoritism become harder to detect.[17]

AmTote and the Lottery argue that, should we take the view we express, our decision would amount to judicial legislation. AmTote states that the "delay and uncertainty

---

[17] AmTote attempts to use *Devir* v. *Mayor of Malden,* 277 Mass. 502 (1931), to attack the principle set out in *Sweezey.* In *Devir,* which involved the same ordinance as *Sweezey,* the court considered a contract for surfacing four streets. Bidders could bid on either or both of two types of paving surface, and the city could award a contract for any one or more of the streets to any bidder. We approved the specifications. AmTote argues that we have therefore approved open parameters.

*Devir,* however, involved a request for bids on a per yard basis. A bidder could supply a per yard bid for each of the two wearing surfaces. Bidders knew the minimum and maximum number of yards for which a contract could be awarded. The court decided that the requirement of bidding by the square yard was not inherently obnoxious to the competitive bidding ordinance: "To effect such a result it must further appear either that the unit basis was subject to change at the will of an official board . . . *or that the unit was not sufficiently definite to furnish a common basis for submission of bids*" (emphasis supplied). *Id.* at 507. *Devir* stands for the proposition that an awarding authority can solicit bids on alternative specifications or on a job whose scope is bracketed within well-defined limits. *Devir* implies neither that entirely open specifications are permissible nor that an awarding authority may invite bidders to supply their own specifications.

inherent in regulation by litigation is destructive of the procurement process." Furthermore, AmTote asserts several reasons for sanctioning problem-oriented specifications. The technique permits the Lottery to learn from industry experts the best design for a lottery computer system. The technique also tests the expertise of the bidders. By leaving specifications open, the Lottery can shift to the vendor certain legal obligations connected with performance of the contract. Finally, if the Lottery filled in the specifications that were left open, only AmTote could comply; thus, the award would fail under the rule of *Waszen* v. *Atlantic City*, 1 N.J. 272, 283 (1949), in which the court invalidated an award made on the basis of overly restrictive specifications.

The defendants are correct that judicial legislation is inappropriate in public procurements law. However, interpreting a statute in accord with its purpose is not to legislate, but merely to serve the Legislature. The purpose of G. L. c. 7, § 22, is to encourage efficient purchasing and to discourage awards based on favoritism. The Legislature may have given up some of the advantages of a more flexible purchasing policy in order to foster honesty and accountability in government.[18] But the Legislature has chosen,

_____

[18] It is not clear that the Lottery had to sacrifice either of the first two advantages that the defendants point out. Before formulating its RFP, the Lottery could have contracted for consultants' services to help determine the best design of an on-line system. Furthermore, by testing the qualifications of would-be bidders before permitting them to bid on the contract, the Lottery could have gauged their expertise.

AmTote's argument that problem-oriented bidding confers certain legal advantages on the awarding authority is based in part on *Alpert* v. *Commonwealth*, 357 Mass. 306 (1970). A contractor on a highway and bridge contract received a substantial equitable adjustment when difficulties with subsurface material proved more extensive than the awarding authority's specifications had represented. We said: "If the D.P.W. had actually intended to leave the determination of the amount of unsuitable material open to the independent investigation of [the contractor], it could easily have omitted the specification from the preliminary quantity sheets." *Id.* at 321. AmTote states: "It is ironic that the Lottery, having accepted the Supreme Judicial Court's suggestion, has been held by the Superior Court Department to have acted illegally."

AmTote's argument ignores a critical distinction between the facts to be specified in *Alpert* and those in the present case. In *Alpert*, the Depart-

and we will not displace or tamper with that choice. Am-Tote's last argument, concerning overly restrictive specifications, raises a question not before us today. We do not decide it. Cf. *Pacella* v. *Metropolitan Dist. Comm'n,* 339 Mass. 338, 346 (1959) (G. L. c. 29, § 8A).

In the view we take, the defendants' arguments that the trial judge's findings of fact are clearly erroneous need not be considered. Our decision rests instead on our view of the statute and the undisputed nature of the request for proposals.

The judgment, as amended, is affirmed.

*So ordered.*

---

. ment of Public Works attempted to describe a condition in nature. The scope of the condition was difficult to ascertain, and the agency's description was in error. Indeed, description to that level of detail may not have been practicable. The facts to be specified by the Lottery did not involve ascertaining the scope of a natural condition. They involved intellectual decisions about the best design of a computer system. Detailed description was practicable because it depended solely on the Lottery's choices.