Burnes, Nonnie S., J.
INTRODUCTION
This case arises out of the decision of the Massachusetts Bay Transportation Authority (“MBTA”), the defendant, to suspend the bidding privileges of Olympic Cleaning, Inc. (“Olympic”). The plaintiff, Olympic, asserts in its complaint that the MBTA suspended Olympic arbitrarily and in bad faith. Olympic also asserts that the suspension was merely pretext for an effort to force Olympic to unionize its employees. The MBTA asserts that it suspended Olympic for health and safety violations and other failures to abide by the contract terms that occurred during performance of its subway cleaning contract. Olympic is before the court seeking a preliminary injunction to prevent the irreparable harm that it says would result if the MBTA is allowed to award new cleaning contracts without allowing Olympic to bid. For the following reasons the plaintiffs motion for a preliminary injunction is DENIED.

BACKGROUND

In 2003, the MBTA solicited bids from the public through its Invitation for Bid process. The MBTA published IFB No. 169-02 (“Subway Cleaning Contract”). Olympic bid on and was awarded the contract to clean several MBTA subway lines. Olympic and the MBTA had already shared a long and uneventful history. Through the course of their fourteen-year relationship Olympic had not received a single OSHA violation, health and safely violation, or a workers’ compensation claim relating to its MBTA contracts.
In the first quarter of 2004, the Service Employees International Union Local 615 (“SEIU Local 615”) complained to the MBTA regarding Olympic’s compliance with the terms of its contract. Although Olympic was not unionized, SEIU Local 615 had gathered Olympic’s employee complaints. Ms. Lauren Jacobs (“Jacobs”) of SEIU Local 615, mailed a letter summarizing the issues to the MBTA’s General Manager, Michael Mul-hern (“Mulhern”). Mulhern testified at his deposition that he also met with individual Olympic employees, who raised new issues and corroborated others regarding Olympic’s performance of the Subway Cleaning Contract. In response to these concerns, Mulhern ordered an audit of the contract to insure compliance. The firm of Mudarri & Mudarri (“Mudarri”) was hired to conduct the audit.

The Audit

Mudarri was engaged to evaluate specific criteria: direct labor and fringe benefits; training specifications; and management policies and internal control provisions of Olympic’s contract with the MBTA. Although the audit was characterized as an investigation into Olympic’s compliance with the business terms of the contract, the audit necessarily implicated safety issues. For example, the contract required Olympic to submit a Material Safely Data Sheet (“MSDS”) for each cleaning chemical used and required Olympic to post the MSDSs at locations where such chemicals were employed.[1]
Olympic identifies an executive summary prepared by C.J. Royster, dated September 8, 2004, that found in each of the four categories listed, Olympic’s performance was, at least, adequate. An e-mail from Robert Doyle, Superintendent of the Orange Line, appears to endorse Royster’s summary and supports the inference that he also believed Olympic to be in compliance with its obligations. The MBTA has responded that it disregarded Royster’s summary as a superficial and inaccurate summarization of the Mudarri Audit. More importantly to the MBTA, the Royster Summary was in contradiction to the opinions of Robert Johnson, the head of MBTA procurement; Robert Hayden, MBTA’s Assistant General Manager for Safety; and Robert Murphy, the MBTA’s Manager of Safety Training. Johnson assessed that Olympic should have been suspended on October 6,2004. Johnson, Hayden, and Murphy all believed that Olympic should continue to be suspended.
By September 2, 2004, Olympic received a final version of the Mudarri Audit. In Olympic’s motion for a preliminary injunction, Olympic asserts that the Mudarri Audit concluded that Olympic was in compliance with the terms of the contract. A thorough reading of the audit identifies numerous failures of Olympic to abide by requirements of the Subway Cleaning Contract. Specifically, the Mudarri Audit noted that Olympic was using floating personnel instead of dedicated personnel and Olympic failed to comply with reporting requirements, failed to have an Emergency Response Plan, failed to satisfy invoicing requirements, failed to properly post MSDSs, and failed to provide adequate insurance coverage for the cleaning project.
A later summary prepared by Anne Herzenberger, the MBTA’s Chief Operating Officer, also analyzed the Mudarri Audit. Her summary concluded that “Olympic was generally performing as required.” Olympic asserts that the Herzenberger Summary supports its interpretation that Olympic was performing the contract as required, furthering their argument for pretext. Although the summary did note that Olympic was generally complying, the summary specifically identified areas where Olympic failed to comply with the terms of the contract.

MassCosh

The Mudarri Audit also contained reference to SEIU Local 615 allegations of inadequate safety education and training, and identified a study conducted by the Massachusetts Coalition for Occupational Safely and Health (“MassCosh”) into the safety and training of *650 Olympic’s employees. Although the Mudarri Audit notes the existence of SEIU Local 615 complaints and the MassCosh reports, the Mudarri Audit accepted as true Olympic’s assertion that its employees had undergone all relevant training. The Mudarri Audit noted that Olympic could not provide documentation of that training. The Mudarri Audit acknowledged the seriousness of the alleged failures and recommended that Olympic should try to exceed the requirements of the Subway Cleaning Contract to alleviate the concerns raised in the MassCosh report. A preliminary version of the MassCosh report was appended to the Mudarri Audit.
On September 21, 2004, the MBTA informed Olympic that it was expanding its review to include the health and safety allegations. The MBTA had become aware of the MassCosh allegations on or about June 28, 2004. Olympic asks this court to infer that the MBTA did not feel the MassCosh allegations were serious or relevant given the delay in actually conducting an investigation.
The MassCosh report described a survey of Olympic employees and raised questions regarding working conditions. The Report determined Olympic was (1) failing to provide adequate training with respect to cleaning up blood and other bodily fluids; (2) requiring employees to use carcinogenic cleaning products; (3) failing to provide proper protective equipment; and (4) failing to provide winter gear. Later review by the MBTA revealed that many of the allegations concerning safety hazards raised by MassCosh were unsubstantiated. The only safety allegation contained in the MassCosh report that was also included in the Mudarri Audit noted the failure of Olympic to provide winter jackets as required by the subway cleaning contracts. The MBTA independently verified this allegation through Richard Hart, the Assistant Superintendent of Station Support Services for the MBTA (“Hart”). The MassCosh report also revealed that Olympic was using a carcinogenic cleaner, “Vandal Mark Remover.” The MBTA realized at this time that Olympic had not submitted a Material Safety and Data Sheet for this cleaning product, in violation of provisions of the contract.

Suspension

On October 6, 2004, the MBTA informed Olympic that it was suspended from bidding on future MBTA procurement contracts. The MBTA based its decision at that time on deficiencies in the performance of the subway cleaning contract. The MBTA indicates in its opposition that Olympic had not corrected issues with: (1) weekly invoices not having summary sheets; (2) inadequate documentation of safety training; (3) no emergency response plan in place; (4) failure to submit quarterly Disadvantaged Business Enterprise (“DBE”) reports;[2] (5) inadequate insurance coverage; (6) and failure to supply winter or rain jackets. The MBTA General Manager, Mulhern, consulted with Robert Johnson (“Johnson”), the Director of Materials Management, and determined that Olympic was not a responsible bidder. [3]
Johnson determined that Olympic would be allowed to continue servicing the Subway Cleaning Contract in spite of his opinion that the MBTA had the ability to terminate the contract because of Olympic’s failures. Johnson decided that Olympic would be given an opportunity to bring its work into compliance with the contract. It is undisputed that the MBTA had a right to terminate the Subway Cleaning Contract and was under no obligation to allow cure in the event of failure to comply with the contract’s provisions.
Olympic took steps to remedy the problems. Richard Hart, Assistant Superintendent of Station Support Services, and Vinton Wong of the MBTA’s Material Management, actively worked with Olympic to correct the deficiencies. As of November 30, 2004, there remained deficiencies in Olympic’s compliance with the contract. Johnson identified a continued failure with DBE requirements, failure to provide all workers with winter coats and rain gear, failure to maintain the proper amount of umbrella insurance, and the safety issues raised by Murphy’s safety audits.

MBTA Safety Audits

Mulhern indicated in his deposition that Olympic workers continued to complain regarding safety violations occurring at the work site even after the suspension. At the November 2004 MBTA Board of Directors meeting, several members of the public addressed the Board with concerns regarding the health and safety of Olympic’s workers. Mulhern determined that safety audits were necessary to address those concerns.
Murphy, the MBTA’s Manager of Safety Training, conducted four safely audits of Olympic’s worksites from November 23, 2004, until February 27, 2005. During the first audit on November 23, Murphy identified a “huge violation.” Murphy observed a worker by himself without a safety vest crossing train tracks.[4] Over the next three audits Murphy continued to observe Olympic employees without safely vests. In addition to the safety vest problem, Murphy noted there were one to three employees without right-of-way safely awareness cards (“ROW’ cards). At each of the four audits Murphy found at least one worker not carrying his identification badge. In a few instances the badges that were worn by Olympic’s employees did not adequately reflect each employees’ training.
In an effort to resolve these issues with Olympic, Murphy and others from the MBTA met with Olympic’s President, Russell Gasbarro (“Gasbarro”) on December 14, 2004. Murphy relayed the violations he noticed, and what he would be looking for on his future safely audits. On Februaiy 8, 2005, after three audits but prior to the fourth and final safety audits, the MBTA sent Gasbarro a letter updating him on the results of the safety audits. The letter identified the areas of concern for the MBTA: (1) not all employees *651 were carrying identification badges; (2) the MBTA was still unable to verify that security training had taken place; (3) not all employees were carrying ROW cards; and (4) not all protective equipment had been issued (winter gear and rain slickers).
Gasbarro sent a return letter in an effort to address Murphy’s concerns on February 10, 2005. Gasbarro indicated in his letter that all his employees understood the need to wear identification badges and ROW cards,[5] had been trained, and had been issued all protective gear. Murphy did not feel the Gasbarro letter adequately addressed the issues raised. It was Murphy’s opinion that observation of compliance might be necessary rather than an affidavit indicating badges and cards would be worn. In addition, Murphy interviewed Olympic employees during his February 27, 2005, safety audit and was told that rain gear still had not been provided.

2005 Subway Cleaning Contract

Olympic’s Subway Cleaning Contract expired on April 30, 2005. The Subway Cleaning Contract included an option to extend at the discretion of the MBTA. The MBTA declined to exercise its option and posted IFB 135-04 on December 28, 2004, for vehicle cleaning services (“2005 Subway Cleaning Contract”). The bid was issued to 33 potential bidders. The MBTA did not invite Olympic to bid on the 2005 Subway Cleaning Contract because of its previous determination that Olympic was not a responsible bidder. On or about February 9, 2005, Olympic submitted a Phase I bid for the 2005 Subway Cleaning Contract.[6] On February 11, 2005, Johnson wrote to Gasbarro notifying him that the MBTA was rejecting Olympic’s bid due to its status as a disqualified bidder.
The MBTA received four Phase II bids on March 2, 2005.[7] Empire Cleaning was determined to be the “lowest responsible bidder” for the 2005 Subway Cleaning Contract.

Bus Cleaning Contract

Prior to the complications in Olympic’s and the MBTA’s relationship, the MBTA had invited Olympic to bid on IFB 34-04 (“Bus Cleaning Contract”). Olympic submitted a Phase I bid. In response the MBTA invited Olympic to submit a Phase II bid. Olympic submitted a Phase II bid. On June 22, 2004, the MBTA determined that Olympic was the lowest bidder. Empire Cleaning, the second lowest bidder, filed a bid protest with the MBTA’s Materials Management. As a result of the bid protest, the MBTA was unable to award the Bus Cleaning Contract. The MBTA then encountered funding limitations that further stalled the award process.
At about this time, the MBTA’s General Manager, Mulhem, decided to suspend Olympic’s bidding privileges.[8] Once Olympic was deemed a non-responsible bidder, its bid for IFB 34-04 was removed from the pool of qualified bidders.
The MBTA’s funding limitations ultimately led to a reduction in the scope of the Bus Cleaning Contract by approximately 15,000 hours. On March 3, 2005, the MBTA’s Materials Management Department determined that Empire Cleaning was the lowest responsible bidder. On April 7, 2005, the MBTA Board authorized Materials Management to award the contract to Empire Cleaning.

SEIU Local 615 and MassCosh Involvement

Olympic draws this court’s attention to the communications between SEIU Local 615 and the MBTA throughout the investigation into Olympic. The record establishes that SEIU Local 615 was in communication with the MBTA as early as April 14, 2004. These communications prompted an investigation into wage rates paid to Olympic employees. The investigation determined that Olympic was in fact paying the prevailing wage.
During the course of the Mudarri Audit of Olympic, the auditor received multiple communications from SEIU Local 615 at the MBTA’s request. In a fax describing the scope of work for Mudarri, the MBTA indicated that Mudarri must contact SEIU Local 615. In the course of conducting its investigation, Mudarri was directed by Johnson to contact SEIU Local 615 prior to contacting Olympic. Mudarri expressed concerns over contacting SEIU Local 615 first, but followed the direction of Johnson.[9]
Olympic also identified that SEIU Local 615 sent a letter to Olympic one day after it was suspended, to arrange a meeting to discuss unionizing Olympic’s employees. In deposition testimony, Jacobs indicated that she sent the letter because “the subsequent decision to bar them from future bids did provoke my sense that this might be a time to talk.”
In a letter dated three days before Olympic was notified of its suspension, an employee of Olympic applauded the decision of the MBTA Executive Board to suspend Olympic. Olympic asserts that “behind the scenes communications” were numerous and ongoing throughout the investigation. Olympic identifies emails between Janice Loux, a labor representative on the MBTA’s Board of Directors, and Marcy Golstein-Gelb, a MassCosh employee. In Loux’s e-mail she offered to gauge management’s temperament before determining how to proceed on alleged violations of the MBTA’s contract with Olympic. The MassCosh e-mail indicates that SEIU Local 615 was seeking to replace Olympic with a unionized company.
The record establishes that SEIU Local 615 engaged in a “Campaign” to require Olympic to correct its safety violations. The record supports an inference that SEIU Local 615 was doing so to force the MBTA to replace Olympic with a unionized company. SEIU Local 615, in conjunction with MassCosh, organized a protest march at the Arlington MBTA station. SEIU Local 615 and MassCosh members testified at MBTA Board of *652 directors meetings. They wrote numerous letters and made numerous phone calls to the MBTA. Olympic asks this court to infer from these communications and pressuring tactics that the MBTA acted in bad faith, merely capitulating under the collective pressure of SEIU Local 615 and MassCosh to either force Olympic to unionize or terminate Olympic’s contract.
Olympic in its motion for preliminary injunction presents as fact that the MBTA’s 30(b)(6) witness, Johnson, is not credible.[10] Although a determination of credibility is not appropriate at this point in the proceeding, the court will weigh the responses made by Johnson in his deposition testimony in light of Olympic’s likelihood of success on the merits.

Summary

The record establishes that SEIU Local 615 and MassCosh exerted significant pressure on the MBTA. As a result of that pressure, the MBTA conducted investigations into Olympic’s contract compliance. These investigations revealed deficiencies in Olympic’s performance of its obligations. Olympic has demonstrated that it took steps to remedy the problems that were presented. It is, however, undisputed that the contract with the MBTA does not require any cure right on the behalf of Olympic. Upon a showing of deficiency on contractual obligations the MBTA has a right to terminate a contract, in this case the 2003 Subway Cleaning Contract.
Olympic’s argument encompasses numerous allegations of bad faith and improper motive in their suspension. Olympic asks the court to draw the inference from the fact that Olympic was merely suspended, that SEIU Local 615 exerted significant pressure on the MBTA, and that SEIU Local 615 was joined by MassCosh in doing so that the MBTA was merely capitulating to the combined pressure of the labor groups or in the alternative colluded with them when suspending Olympic. On this basis, Olympic asserts the MBTA’s decision was arbitrary, capricious, and made in bad faith. This court must determine if Olympic has carried its burden for granting preliminary relief

DISCUSSION

Courts must consider certain factors when deciding motions for preliminary injunctions: (1) plaintiffs likelihood of success on the merits; (2) the risk of irreparable harm to the plaintiff; and (3) the irreparable harm to the defendant if the motion for an injunction is allowed. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). When a party seeks to enjoin governmental action, a judge is “required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Com. v. Mass. CRINC, 392 Mass. 79, 89 (1984).

Likelihood of Success on the Merits

In order for Olympic to succeed at trial, it must demonstrate that the MBTA acted in bad faith or arbitrarily and capriciously when it suspended Olympic’s bidding privileges on all MBTA contracts. John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass. 124, 130-31 (1999).
Olympic has introduced a voluminous record that establishes that the MBTA was in communication with SEIU Local 615 and MassCosh during the course of their investigation into Olympic. The record also establishes that SEIU Local 615 was seeking to either replace Olympic as the supplier of cleaning services to the MBTA or to have Olympic unionized. It is fair to infer that SEIU Local 615 felt that Olympic’s employees would be better served if they were part of the service employees’ union.
The record before this court does not, however, establish that the MBTA acted in bad faith, capriciously or arbitrarily. That a member of the MBTA’s Board of Directors, Janice Loux, was in communication with MassCosh carries less significance in light of the MBTA’s testimony that Loux had no influence over nor was she involved in the decision to suspend Olympic. Although the fact that the MBTA was in communication with MassCosh and SEIU Local 615 might support the inference that the MBTA acted in bad faith, the fact that the parties were in communication is equally open to other interpretations. SEIU Local 615 may simply have been doing eveiything in its power to advocate for Olympic’s employees without having any improper influence over the MBTA.
Olympic’s argument of bad faith is bolstered by the alleged timing of events in this case. The Mudarri Audit was initiated to determine Olympic’s compliance with the business terms of the Subway Cleaning Contract. According to Olympic, Olympic received notice of its deficiencies on September 21, 2004. Olympic asks the court to infer from its suspension on October 6, 2004, that the MBTA acted quickly and did not give Olympic a reasonable time to respond because of some ulterior motive. This argument fails to assist Olympic in showing, at this stage of the proceeding, that it is likely to succeed on the merits. As Olympic admits, it had no right to cure any of the deficiencies the MBTA discovered in its investigation; the MBTA could have terminated the contract immediately. Moreover, without additional support, timing alone does not make a showing of likelihood of success, especially in light of other interpretations, and the MBTA’s contention that Olympic received notice of its deficiencies far earlier than September 21, 2004.
The present record establishes that the MBTA received numerous complaints about Olympic Cleaning’s compliance with the terms of its contract. The MBTA responded to these allegations by investigating them. The MBTA hired an outside auditor to evaluate Olympic’s performance. The audit deter *653 mined that Olympic was not in compliance with all the terms of its contract.[11] A decision was made to suspend Olympic from bidding on all MBTA contracts. The MBTA determined in light of Olympic’s failure to comply with the terms of its contract it would no longer be deemed a “responsible bidder.” The determination of responsibility was in accord with the MBTA’s policy and procedures manual.
The court’s role in evaluating the MBTA’s decision is clear. The MBTA is entitled to deference in determining whether a parly is responsible for purposes of bidding on MBTA contracts. Datatrol, Inc. v. State Purchasing Agent, 379 Mass. 679, 698 (1980). In a recent decision involving the MBTA, the court noted that a determination of responsibility “is left to the reasonable judgment of the officers charged with the responsibility therefor.” Cubic Transportation Systems, Inc. v. MBTA, 2003 Mass.Super. LEXIS 500 at * 8 (2002) (Van Gestel, J.). “The courts should not substitute their judgment for the judgment of the agencies charged with making discretionary decisions.” Id.
In light of the deference due to the MBTA’s decision, the inferential case that Olympic offers does not satisfy its burden of showing a likelihood of success on the merits. Any inference of bad faith is outweighed by undisputed facts showing that Olympic failed to meet numerous obligations during the course of its performance of the Subway Cleaning Contract and the MBTA could have terminated the contract for any one of those failings.[12]

Irreparable Harm

“In the context of a preliminary injunction the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity.” Packaging Industries Group, Inc., 380 Mass, at 617.
The Court has granted a preliminary injunction to an unsuccessful bidder on the basis that the lost opportunity to bid constituted irreparable harm. Modern Continental Construction Co., Inc. v. City of Lowell, 391 Mass. 829, 830 (1984). The Court held that plaintiff established irreparable harm by showing that, “the opportunity for consideration as a bidder would be forever lost, and its remedy at law incurred in preparing its bids falls far short of being the equivalent of the potential to win the contract.” Id. at 837. The City of Lowell committed itself to following the statutory procedure that provided for pre-qualification; the City did not follow this procedure. The Court expressed strong dissatisfaction with the defendant for not following the proper bidding procedure, noting that injunctive relief was appropriate because, “the agency’s own actions necessitated increased expenditures.” Id. at 838. Unlike the circumstances of Modern Continental, where an award of the contract would have precluded Modern Continental from rebidding and precluded any chance of a contract award, if Olympic demonstrates that the MBTA refused its bid on the Bus Cleaning Contract in bad faith, it would be entitled to recover its lost profits because it had submitted a Phase I bid, a Phase II bid, and was determined the lowest bidder. See Peabody Construction Co, Inc. v. City of Boston, 28 Mass.App.Ct. 100, 106 (1989). The quantum of damage suffered by Olympic in such circumstances would be measurable and subject to an award at the conclusion of this case.
The harm that could result from Olympic’s suspension from bidding on the 2005 Subway Cleaning Contract stands on different footing from the Bus Cleaning Bid. With respect to the 2005 Subway Cleaning Contract Modern Continental indicates that Olympic has demonstrated irreparable harm. Just as in Modern Continental Olympic would not have the opportunity to be considered as a bidder and recovery of preparation costs would be an insufficient remedy.[13] Olympic has demonstrated irreparable harm as to the 2005 Subway Cleaning Contract.

Balancing the Harms to the Parties

In deciding a motion for preliminary injunction the court must balance the irreparable harm to the plaintiff in light of its chance of success on the merits against the defendant’s probable harm and its likelihood of prevailing on the case. Com. v. Mass. CRINC, 392 Mass 79, 87 (1984). Olympic contends that imposing an injunction upon the MBTA would result in no harm. The record establishes, however, that Olympic did in fact fail to satisfy all of the requirements of its contract with the MBTA. The record also establishes that some of those failures went directly to the safety and well-being of Olympic’s employees. By imposing an injunction that requires the MBTA to continue to employ Olympic, the court would be forcing the MBTA to employ a party that did not conform to its requirements. In light of the evidence of safety issues, an injunction could have significant impact on the MBTA. The balance of the harms weighs in favor of the MBTA.

Public Concern

When a party seeks to enjoin governmental action, a judge is “required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Com v. Mass. CRINC, 392 Mass. 79, 89 (1984).
The parties assert two significant public interests that compete in the determination of granting Olympic’s motion for a preliminary injunction. On one hand, Olympic has demonstrated there is a public interest in a competitive bidding system and fair dealing. See Datatrol 379 Mass, at 696. On the other hand, the MBTA is correct in that the public is invested in insuring the safety of workers engaging in public contracts. In addition, at issue in this case is the *654 public transportation system for the Commonwealth. Questions of safety on job performance has the potential to directly impact the public at large.
The MBTA’s Director of Materials Management noted that the imposition of an injunction in this case would undermine his decision on responsible bidders, impacting the MBTA’s ability to enforce its contractual obligations. Inherent in the competitive bidding system is the idea that the public is served by only allowing responsible bidders to compete.
The public interests in this case weigh in favor of the MBTA, and in favor of denying Olympic’s motion for preliminary injunction.

Conclusion

At this stage of the proceeding, Olympic has failed to establish its likelihood of success on the merits. Although Olympic did establish irreparable harm as to the 2005 Subway Cleaning Contract, following the calculus laid out in Mass. CR1NC this court determines that in light of Olympic’s failure to show likelihood of success on the merits, the balance of harm weighing in favor of the MBTA, and the public interest also weighing in favor of the MBTA that Olympic is not entitled to a preliminary injunction.

ORDER

For the foregoing reasons, the plaintiffs motion for preliminaiy injunction is DENIED.

In addition, Mudarri analyzed Olympic’s compliance with the requirement to perform CORI checks, pre-employment drug tests, have available an Emergency Response Plan, train all staff appropriately, and provide cleaning employees training manuals when hired. These requirements relate to the business terms of the contract and also to employee safety.

The MBTA admits that Olympic’s failure to comply with DBE requirements was only discovered after the Mudarri Audit.

Responsibility is determined according to the MBTA’s policy and procedures manual. It states in part: “Contractor/Manufacturer/Supplier who has the capability in all respects to perform fully to all contract requirements, and the integrity and reliability which will assure good faith performance. Specifically, the factors taken into consideration in determining which bidders are responsible include, but are not limited to: Past Performance, including delivery; Quality Assurance/Control; Plant capacity, manufacturing facility; DBE Efforts; Dun and Bradstreet Financial Rating."

Murphy explained that the safety vest requirement was specifically enacted so workers on the tracks would be more visible to oncoming trains.

 01ympic provided an affidavit indicating their understanding of the need to wear badges and safety vests with each employees’ signature.

The MBTA’s procurement process for the contracts in question involves a two-phase bidding process. The IFB dictates the terms of a bidding party’s Phase I bid. The Phase I requirements include a statement of financial interest, right-to-know law certification, child care certification, performance guarantee certification, DBE participation certificate, DBE identification and information form, DBE affidavit, DBE letter of intent, affidavit of non-collusion, certification(s) relative to debarment, certification of restrictions on lobbying. The MBTA determines which Phase I bids are in accord with the specifications, and invites those bidders to submit a Phase II bid.

Phase II bids require a deposit and that the bidder’s offer be irrevocable for a period of 90 days. If a Phase II bid is the lowest responsive and responsible bid, the contract will be awarded.

The MBTA’s witness was unable to say on what exact date the MBTA suspended Olympic’s bidding privileges as to the Bus Cleaning Contract.

Rhe record does not reflect the specific concerns expressed by Mudarri.

Olympic points to Johnson’s inability to clarify details of the MBTA’s investigation into Olympic. Johnson did. not recall a meeting where the purpose of the Mudarri Audit was discussed, did not recall insisting Mudarri contact Lauren Jacobs of SEIU, did not recall conversations with Olympic discussing results of audit, and did not recall when the MBTA’s concerns regarding specific issues were conveyed to Olympic. Johnson also could not recall when the MassCosh allegations came into the possession of the MBTA. Johnson could not testify as to whether the change in scope of the Bus Cleaning Contract had any impact on the MBTA’s decision not to award Olympic the contract in July of 2004. Olympic points to additional instances where Johnson could not recall the specific details of events.

Although Olympic has identified certain summaries of the Muddari Audit that conclude that Olympic’s performance was at least adequate, the audit itself contains examples of Olympic’s non-compliance.

Ofympic correctly cites Boston Harbor Commuter Service, Inc. v. MBTA, 46 Mass.App.Ct. 122, 126 (1999), for the proposition that a denial on a preliminary injunction is warranted where there is no indicia of arbitrary and capricious conduct. That proposition does little to assist Olympic. They bear the burden of demonstrating that they are likely to succeed on the merits. Merely providing indicia of arbitrariness or bad faith is not enough. Likewise the citation to Capuana, Inc. v. School Building Committee of Wilbraham, 330 Mass. 494, 496 (1953), is unhelpful to this court’s determination. The Court in Capuana noted, in the absence of illegal or arbitrary action, an agency’s conclusions as to matters of fact within their jurisdiction cannot be controverted. Id. Such a general proposition without more is of little assistance in determining if the facts of this case warrant a determination that Olympic is likely to demonstrate that arbitrary or illegal action has in fact taken place, or that inferences from established facts would be sufficient.

The MBTA properly cites Yards Metals, Inc. v. New England Patriots, L.P., 16 Mass. L. Rep. 733 (2003) (Sikora, J.), for the proposition that delay in filing a request for a preliminary injunction can weigh against a showing of irreparable harm. Olympic was suspended by the MBTA on October 6, 2004. Olympic did not challenge its suspension at that time. Six months later Olympic is now challenging the suspension. Although the time frame is similar to that of Yards Metals, Olympic has been trying to resolve the issues presented in its suspension. Olympic feels it has made significant strides in resolving the problems but because of the MBTA’s bad faith more issues are manufactured whenever Olympic is nearing compliance. Therefore, it only became clear that an injunction would be necessary much more recently. The delay of six months, here, does not change this court’s analysis that Olympic has shown irreparable harm on the 2005 Subway Cleaning Contract.