MARK ANDREWS & others[1] *vs.* CITY OF SPRINGFIELD.

No. 08-P-895.

Hampden. April 8, 2009. - November 3, 2009.

Present: VUONO, MEADE, & FECTEAU, JJ.

*Practice, Civil,* Summary judgment, Standing. *Contract,* Construction contract, Lease of real estate, Public works, Bidding for contract. *Public Works,* Bidding procedure. *Statute,* Construction.

A civil action brought pursuant to G. L. c. 40, § 53, by taxpayers alleging violation of a competitive bidding statute, G. L. c. 149, §§ 44A et seq., was timely filed for the purpose of conferring standing on the taxpayers. [681-682]

In an action brought in Superior Court pursuant to G. L. c. 40, § 53, by taxpayers residing in the city of Springfield (city), claiming that the city had violated a competitive bidding statute, G. L. c. 149, §§ 44A et seq., by entering into lease and option to purchase agreements (agreements) resulting from a request for proposal (RFP), the judge erred in granting summary judgment in favor of the city on the ground that it was only required to and did in fact comply with the process for acquiring a lease set forth in G. L. c. 30B, where the RFP, while styled as a lease, was in reality a construction project subject to the bidding procedures set forth in G. L. c. 149, and where it was undisputed that the city did not comply with those procedures, thus rendering the agreements invalid. [682-685]

CIVIL ACTION commenced in the Superior Court Department on June 10, 2003.

A motion for summary judgment was heard by *Judd J. Carhart,* J., and entry of judgment was ordered by *Cornelius J. Moriarty, II,* J.

*Christopher N. Souris* for the plaintiffs.

*Harry P. Carroll* (*Edward M. Pikula,* City Solicitor, with him) for the defendant.

*Martha Coakley,* Attorney General, & *Karla E. Zarbo,* As-

---

[1]Joyce Andrews, Francis Harnois, Robert Hanois, Russell Pepe, Antonette Pepe, Edward J. Nieves, Sharon Nieves, John Scammon, and Robin Scammon.

sistant Attorney General, for the Commonwealth & another, amici curiae, submitted a brief.

VUONO, J. The plaintiffs are taxpayers who reside in the city of Springfield. They brought this action in Superior Court pursuant to G. L. c. 40, § 53,[2] claiming that Springfield violated a competitive bidding statute, G. L. c. 149, §§ 44A et seq. (c. 149), in connection with the construction of a new regional animal control center (center). In 2003, Springfield entered into a "lease" agreement with Monarch Enterprises, LLC (Monarch),[3] whereby Monarch agreed to build the center, according to Springfield's detailed specifications, and Springfield would lease the center for up to twenty-five years. A separate agreement executed on the same day gave Springfield the option to purchase the center for one dollar at the end of that term.

The plaintiffs filed a motion for summary judgment, which was denied.[4] The judge reasoned that Springfield was only required to, and did in fact, comply with the process for acquiring a lease set forth in G. L. c. 30B, as Springfield argued. See G. L. c. 30B, § 16(*c*)(1). Judgment was subsequently entered in favor of Springfield, and the plaintiffs have appealed.[5] We conclude that Springfield's request for proposal (RFP), while styled as a lease, was in reality a construction project subject to the bidding procedures set forth in c. 149. Because it is undisputed that Springfield did not comply with these procedures, the lease and option to purchase agreements are invalid.[6] The judgment is

[2]Under G. L. c. 40, § 53, ten taxpayers of a city or town may commence an action seeking the enforcement of laws governing the expenditure of tax money by local officials. See *Edwards* v. *Boston*, 408 Mass. 643, 646 (1990); *LeClair* v. *Norwell*, 430 Mass. 328, 329 n.2 (1999).

[3]Monarch is not a party to this action and did not attempt to intervene.

[4]A different Superior Court judge denied the plaintiffs' application for a preliminary injunction, which sought to enjoin Springfield from making payments to Monarch under the lease. Although that judge ruled that the lease agreement was subject to c. 149, she concluded that the relief sought would adversely affect the public interest and therefore denied the application. See *LeClair*, 430 Mass. at 331-332. We affirmed the denial in an unpublished memorandum and order pursuant to our rule 1:28. See *Andrews* v. *Springfield*, 63 Mass. App. Ct. 1117 (2005).

[5]Following the parties' joint motion for entry of judgment, which was treated as Springfield's cross motion for summary judgment by another Superior Court judge, judgment was entered in favor of Springfield.

[6]See *Majestic Radiator Enclosure Co.* v. *County Commrs. of Middlesex*,

vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.[7]

*Background.* The following material facts are not in dispute. In 1998, Springfield and several other neighboring communities assumed control of the Thomas J. O'Connor Regional Dog Control Center located in Chicopee. Less than two years later, the Commonwealth acquired the property for the purpose of constructing a new correctional facility. That action required the relocation of the center. Eventually, Springfield, Chicopee, Holyoke, and West Springfield entered into an agreement to procure a replacement facility and designated Springfield as the "lead community" for this endeavor.

On January 16, 2002, Springfield issued a RFP to solicit bids for the "long-term lease and lease/purchase" of a replacement regional animal control facility. Springfield hired an architect to prepare a set of requirements for the center, which included detailed project specifications, design concepts, and comprehensive architectural drawings. These requirements were included in the RFP, and all bidders were required to meet them in order for their proposals to be considered responsive. The RFP also set forth minimum lease terms of twenty or twenty-five years and specified that proposals were required to include an option to purchase the center at the end of the term for one dollar.

Four bidders submitted proposals, only three of which were deemed responsive. The contract was awarded to Monarch, the lowest bidder, in October, 2002. On March 3, 2003, Monarch purchased the property designated in its proposal as the site for the center from Fontaine Brothers, Inc. (Fontaine),[8] for $300,000. Monarch also employed Fontaine as its general contractor for construction of the new center. The estimated cost of construction was $3 million.

---

397 Mass. 1002, 1003 (1986) ("failure to follow the bidding procedure in any respect is fatal"). See, e.g., *Baltazar Contractors, Inc.* v. *Lunenburg*, 65 Mass. App. Ct. 718, 720-724 (2006) (contract void due to town's failure to comply with bidding requirement; contractor could not recover costs and expenses in quantum meruit).

[7]We acknowledge the amicus brief submitted in support of the plaintiffs by the Attorney General, on behalf of the Commonwealth and the Inspector General.

[8]Although the deed indicates the property was purchased from Fontaine, Inc., the parties appear to agree that the seller was Fontaine Brothers, Inc.

Springfield and Monarch executed the lease and option to purchase agreements on March 18, 2003. The lease agreement required Monarch to construct a 22,739 square foot building "in full compliance with the RFP." Springfield retained the right to review and approve any changes to design and construction documents. In addition, Springfield reserved, and ultimately exercised, the right to hire a professional construction manager to inspect and approve each phase of the construction. The lease was for a twenty-five year term and required Springfield to pay Monarch $380,000 in annual rent for each of the first ten years. The annual rent for subsequent years was subject to periodic increases based on a formula corresponding to the consumer price index. Springfield's rental obligations commenced on the date of occupancy. The option to purchase agreement provided Springfield with the opportunity to acquire ownership of the center at varying intervals for amounts ranging from $3,998,974.71 after five years, to one dollar at the end of the twenty-five year term.

*Discussion.* The central issue is whether the project was properly bid under G. L. c. 30B, as the judge concluded, or whether it should have been bid under c. 149. "On review of summary judgment, we . . . consider the record and the legal principles involved without deference to the motion judge's reasoning." *Clean Harbors, Inc.* v. *John Hancock Life Ins. Co.,* 64 Mass. App. Ct. 347, 357 n.9 (2005). Our review is de novo.[9]

a. *Standing.* We briefly address Springfield's contention that the plaintiffs lack standing under G. L. c. 40, § 53, because they filed suit almost three months after the lease agreement was executed.[10] The statute confers standing on qualified taxpayers in circumstances when a municipality is "about to . . . expend money *or* incur obligations" for an unlawful purpose.

---

[9]Springfield contends that we should apply a deferential standard of review to its decision to proceed under c. 30B, rather than c. 149. There is no merit to this contention. Springfield has not provided us, nor have we found, any persuasive authority supporting this position.

[10]The plaintiffs argue that Springfield has waived its challenge to standing because it did not oppose summary judgment on this theory. We reject this argument because "standing is a jurisdictional issue that cannot be waived." *Locator Servs. Group, Ltd.* v. *Treasurer & Recr. Gen.,* 443 Mass. 837, 846 n.12 (2005).

G. L. c. 40, § 53 (emphasis supplied).[11] While it is correct that Springfield incurred an obligation on March 18, 2003, it was not required to "expend money" until the center was completed and its rental obligations began. Here, the complaint was filed while construction was ongoing, well before Springfield was required to "expend money" under the lease. Consequently, the suit was timely filed for the purpose of conferring standing on the taxpayers.[12] See *Fuller* v. *Trustees of Deerfield Academy*, 252 Mass. 258, 260-261 (1925). Contrast *Spear* v. *Boston*, 345 Mass. 744, 746 (1963) (claims by taxpayers for injunctive relief to bar awarding of contract and payment of city funds thereunder became moot when contract expired by its terms and thus required no further payments).

b. *Character of RFP.* Chapter 149, § 44A(2), as appearing in St. 1985, c. 675, in pertinent part, states: "Every contract for the construction [or] reconstruction . . . of any building by a public agency estimated to cost more than [$25,000] except for a pumping station[13] . . . shall be awarded . . . on the basis of competitive bids in accordance with the procedure set forth in [c. 149]."[14] Chapter 30B, in pertinent part, states that it "shall apply to every contract for . . . real property . . . [and] shall not apply to . . . a contract subject to the provisions of [c. 149]."

[11]See *Bleich* v. *Maimonides Sch.*, 447 Mass. 38, 46-47 (2006), quoting from *Eastern Mass. St. Ry.* v. *Massachusetts Bay Transp. Authy.*, 350 Mass. 340, 343 (1966) ("It is fundamental to statutory construction that the word 'or' is disjunctive 'unless the context and the main purpose of all the words demand otherwise' ").

[12]We observe that Springfield's argument that the plaintiffs were at fault for not filing their complaint earlier was rejected by the judge who ruled on the plaintiffs' application for a preliminary injunction. She concluded that any delay in bringing a suit was the result of Springfield's failure to comply with the applicable notice requirements. On the record before us, however, we are unable to determine whether Springfield's failure in this regard provides an alternate basis for conferring standing on the plaintiffs.

[13]As the instant case does not involve a pumping station, we shall omit this exception from our discussion.

[14]We cite to the statutes in effect during the relevant time period. At that time, c. 149 applied to contracts estimated to cost more than $25,000. Although we note that the Legislature altered the monetary scheme of c. 149, see St. 2004, c. 193, § 11, as well as made other significant changes to competitive bidding procedures in 2004, see, e.g., St. 2004, c. 193, § 27, we express no opinion as to how application of any subsequent statutory changes would affect our analysis.

G. L. c. 30B, § 1(*a*), (*b*)(1), inserted by St. 1989, c. 687, § 3. Section 16 of G. L. c. 30B also states that proposals shall be solicited prior to "acquiring by purchase or rental real property or an interest therein . . . at a cost exceeding [$25,000]." G. L. c. 30B, § 16(*c*)(1), as amended through St. 1995, c. 131, § 2.

We think the statutory provisions at issue are clear and unambiguous. See *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701, 704 (1984) ("statutory language, when clear and unambiguous, must be given its ordinary meaning"). Chapter 149 applies to construction contracts for buildings estimated to cost more than $25,000. Chapter 30B applies to contracts for real property, including both purchase and lease contracts, and for the construction of buildings estimated to cost $25,000 or less.

To determine which statute applies in the instant circumstance, our cases require that we examine "the character of the RFP." *Datatrol Inc.* v. *State Purchasing Agent*, 379 Mass. 679, 695 (1980). *Thorn Transit Sys. Intl., Ltd.* v. *Massachusetts Bay Transp. Authy.*, 40 Mass. App. Ct. 650, 653-655 (1996). Here, our examination of the character of the RFP indicates that it is for the construction of a highly specialized " 'State of the Art' animal center," built in accordance with Springfield's detailed specifications. For example, the RFP required that all building systems (plumbing, heating, air conditioning, ventilation, lighting, and electrical) be new, and it set forth (1) the size and location of over eighty-five rooms, (2) explicit descriptions of windows, doors, ceiling tiles, flooring, and paint, (3) the manufacturer and model numbers for sinks, toilets, drains, showers, and urinals, and (4) specifications for specialty heating/ventilation/air conditioning systems. Further, the stated purpose of the RFP was to provide Springfield, a public entity, with a replacement animal control center for long-term use and the opportunity ultimately to acquire ownership of the center for one dollar. In addition, the RFP essentially provides that the cost of construction will be paid for with public funds in the form of rental payments for the "leased premises." In effect, the RFP used a lease-to-purchase arrangement as a means of conveying a newly constructed facility to Springfield. Accordingly, the "character of the RFP" supports the conclusion that the project was for the construction of a public building.

It is not determinative, as Springfield contends, that the RFP

did not preclude bid proposals involving the renovation of an existing building. Chapter 149 applies both to construction of a new building and the "reconstruction . . . of any building" so long as the statute's monetary threshold has been met. G. L. c. 149, § 44A(2).

Nor is the result determined by the fact that Springfield showed "good faith" by contacting the office of the Inspector General before issuing the RFP.[15] Springfield acknowledges, as it must, that the Inspector General never reviewed the RFP or provided any opinion whether the project was subject to c. 149. Moreover, the absence of bad faith or actual corruption does not excuse the failure to comply with the competitive bidding statutes. See *Gifford* v. *Commissioner of Pub. Health*, 328 Mass. 608, 617 (1952); *Phipps Prod. Corp.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. 687, 692 (1982); *E. Amanti & Sons, Inc.* v. *R.C. Griffin, Inc.*, 53 Mass. App. Ct. 245, 257 (2001).

Also relevant to our analysis is the high degree of control Springfield retained over the details of construction. The RFP required the submission of design and construction documents for Springfield's review and approval and provided for the right of Springfield to hire its own professionals to monitor, inspect, and approve the ongoing construction. These facts demonstrate that Springfield sought to direct construction far more than is customary for a commercial tenant.

Having determined that the RFP was for the construction of a new public building costing more than $25,000, it follows that Springfield was required to comply with the bidding procedures of c. 149, rather than the procedures of c. 30B.[16] See *Datatrol Inc.*, 379 Mass. at 695-696 (competitive bidding statute applied

---

[15]Springfield's "contact" consisted of three telephone calls placed by an associate city solicitor to the "attorney of the day" at the Inspector General's office. During one of these telephone conversations the "attorney of the day" indicated that Springfield "probably could" structure the RFP as a lease to purchase under c. 30B, but recommended that Springfield submit the RFP to the Inspector General's office for review.

[16]Our conclusion is also consistent with the objective of c. 149. The Legislature enacted and later extensively revised c. 149 in an effort "to improve the system of public construction in the Commonwealth." See St. 1980, c. 579, preamble & § 55. The statute's purposes are transparent: "to ensure that the awarding authority obtain the lowest price among responsible contractors," *Modern Continental Constr. Co.* v. *Lowell*, 391 Mass. 829, 840 (1984); "to establish an open and honest procedure for competition for public

where RFP provided contract could involve equipment purchase, and operating and maintenance services in contract were incidental to equipment purchase). The plain language of the statutes themselves makes clear that the Legislature did not intend to permit public agencies to avoid compliance with c. 149 by relying on c. 30B. General Laws c. 149, § 44A(2), applies to "*[e]very* contract for the construction . . . of any building by a public agency" (emphasis supplied). The use of the modifier "every" is significant, as it reflects the Legislature's intent that c. 149 apply to all contracts that involve public construction other than narrowly and carefully drawn exceptions. See *Norfolk Elec., Inc.* v. *Fall River Hous. Authy.*, 417 Mass. 207, 217-218 (1994). By contrast, c. 30B specifically excludes public construction contracts subject to c. 149. See G. L. c. 30B, § 1(*b*)(1). Accordingly, the RFP was subject to c. 149. See *Datatrol Inc.*, *supra* (public agencies cannot use long-term leases as means of evading competitive bidding requirements for procurement of equipment).

Springfield's last argument, that the doctrine of claim preclusion applies to bar the plaintiffs' case, was not raised or argued below and may not now be argued for the first time on appeal. See *Carey* v. *New England Organ Bank*, 446 Mass. 270, 285 (2006). We deem this argument waived. See *ibid.*

*Conclusion.* The judgment is vacated. The case is remanded to the Superior Court for entry of a new judgment declaring that Springfield's lease and option to purchase agreements with Monarch are void because Springfield failed to comply with c. 149 and for the grant of such other relief as may be determined to be appropriate.[17]

*So ordered.*

---

contracts," *ibid.*; and to "facilitate[] the elimination of favoritism and corruption as factors in the awarding of public contracts." *Interstate Engr. Corp.* v. *Fitchburg*, 367 Mass. 751, 758 (1975).

[17]Based on the record before us, we are unable to determine whether the public interest would support entering an order enjoining Springfield from making payments in accordance with the lease or, in the alternative, whether such action would adversely affect the public. Accordingly, we take no position on this issue.