# Brasi Development Corp. *vs.* Attorney General & another.[1]

Middlesex. January 7, 2010. - May 10, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Contract,* Bidding for contract, Construction contract, Lease of real estate, Public works. *Public Works,* Bidding procedure, Specifications. *University of Massachusetts.*

Discussion of the competitive bidding statute, G. L. c. 149, §§ 44A-44H, governing the solicitation and acceptance of proposals for public construction projects by State agencies, and other statutes governing State agencies' acquisition, by lease or purchase, of interests in real property. [689-692]

This court concluded that a totality of the circumstances test is to be used to determine whether a so-called "build to lease" agreement entered into by a public agency is subject to the competitive bidding statute, G. L. c. 149, §§ 44A-44H, including consideration of, among other factors, the extent of control retained by the public agency during development and construction, and the length of the proposed lease. [694-698]

An agreement between a developer and the State university for the development, maintenance, and long-term lease of a dormitory was subject to the competitive bidding statute, G. L. c. 149, §§ 44A-44H, where, although the request for proposals (RFP), viewed in isolation, indicated that the statute did not apply, the lease agreement differed substantially from the RFP in provisions that were critical to determining whether the character of the agreement was, in essence, a contract for construction by a public agency to which the statute would apply, rather than a lease, in that the lease agreement provided for a much longer maximum term, construction by the developer of an entirely new building rather than the use of an existing building, and significantly greater control and approval over the construction process by the university (including the right for the university to attend weekly construction meetings and to approve various phases of the work); further, the lease agreement would have resulted in creation of a building that was dependent on the continuing use of university land, i.e, the use of a university parking lot to meet zoning requirements for dormitory parking and the grant of an easement to the developer to build a pedestrian bridge to the parking lot. [698-707]

Civil action commenced in the Superior Court Department on September 10, 2008.

The case was heard by *S. Jane Haggerty,* J., on motions for summary judgment.

[1]University of Massachusetts, Lowell (university).

The Supreme Judicial Court granted an application for direct appellate review.

*Karla E. Zarbo*, Assistant Attorney General (*Kate J. Fitzpatrick*, Assistant Attorney General, with her) for the Attorney General.

*Andre A. Sansoucy* (*John C. McCullough* with him) for the plaintiff.

*Elizabeth A. Sloane & Nicole Horberg Decter*, for Massachusetts Building Trades Council & another, amici curiae, submitted a brief.

COWIN, J. In this case we consider whether an agreement for the development, maintenance, and long-term lease of dormitory facilities by the University of Massachusetts, Lowell (university), was subject to the competitive public bidding requirements of G. L. c. 149, §§ 44A-44H (competitive bidding statute), where the developer agreed to assume the risks of construction and maintain ownership of the land and buildings, but the university provided detailed specifications for the facility and retained significant control over the construction process. A judge in the Superior Court concluded that the competitive bidding statute did not apply because the agreement was for the lease of a completed student dormitory and not a contract for construction of a dormitory by the university. She therefore allowed the developer's motion for summary judgment. We reverse.[2]

1. *Background and procedural history.* We set forth the undisputed material facts gleaned from the summary judgment record, reserving for later discussion certain terms in the request for proposals (RFP) and the agreement subsequently entered into between the plaintiff and the university.

In February and March of 2008, the university, a division of the publicly-funded University of Massachusetts system, see G. L. c. 75, § 1, issued an RFP for the lease of a student dormitory in the city of Lowell (city) to provide housing for 120 to 400 students.[3] The RFP sought a five-year lease with the potential

[2] We acknowledge the joint amicus brief of the Massachusetts Building Trades Council and the Foundation for Fair Contracting of Massachusetts.

[3] The request for proposals (RFP) sought bids for a "privately developed resident housing facility located in close proximity to the University Campus." The facility was variously described as a "resident housing complex or complexes" and an "apartment complex or complexes."

to extend the agreement for two additional five-year terms. The RFP did not provide that the resident housing complex be newly constructed but did provide detailed requirements for the proposed dormitory, particularly in the area of building security.[4]

The RFP set forth an occupancy schedule under which, if construction were required, the project was to be completed within fifteen months, and stated that the occupancy date was a critical factor in any proposal; the facility had to be available for occupancy by August, 2009, in time for the university's fall, 2009, term.[5] The university was not required to make any payments until the dormitory was available for occupancy, and there were substantial penalties, including costs of replacement housing and storage of goods, if the selected bidder did not meet the work schedule. The university was responsible only for the lease payment amounts, and not for any increases in construction costs or other costs during the lease period.

Under the terms of the RFP, the selected bidder would maintain the building and grounds in good repair for the period of the lease; provide day-to-day upkeep such as snow removal, landscape maintenance, trash removal, and daily cleaning of the facility; and assume all costs of operation and maintenance. The bidder was responsible for all utility payments, including telephone, Internet access, and cable television. The bidder was required to maintain liability insurance on the property, with the university as an additional named insured. The RFP included a sample form lease;[6] among other provisions, the sample lease stated that it could not be assigned, nor could any easement be granted on the property, without the university's written approval. The bidding process was open and public, but the RFP did not conform to the competitive bidding statute.[7] To the contrary, the

---

[4]The initial RFP included a requirement that the university retain a right of first refusal to purchase the dormitory at the expiration of the term of the lease agreement. In response to questions concerning the RFP from potential developers at a scheduled pre-bid meeting, the university agreed to forgo this requirement.

[5]The RFP stated that proposed occupancy by fall, 2008, would also be considered.

[6]The sample lease was based on sample lease agreements provided by the Division of Capital Asset Management (DCAM).

[7]As far as can be determined from the record, the submission process appears to have complied with the terms of G. L. c. 30B, § 16 (*c*) (1), regarding solicitation of proposals to lease or purchase real property.

RFP stated that selection would not necessarily be based on the lowest price among "responsible" bidders. See G. L. c. 149, § 44D, and note 15, *infra.*

The plaintiff, Brasi Development Corp. (Brasi), was one of seven companies to respond with bid proposals. Three of the bidders, including Brasi, proposed to construct new buildings; two proposed renovation of existing structures; and two proposed using existing structures "as is." Brasi had never built student housing[8] and had not been certified by the Division of Capital Asset Management (DCAM) as a "responsible" public bidder under G. L. c. 149, § 44D.[9] Brasi was eventually chosen as the developer, subject to additional conditions not included in the terms of the original RFP. The university and Brasi entered into negotiations for a "Lease Agreement" based on the terms of the sample lease agreement that had been attached to the RFP. The "Lease Agreement" was for an initial five-year term, renewable in five-year terms, at the university's option, for up to a total of thirty years; this term was different from that in the RFP. See part 3.d, *infra.* The property would at all times be owned by Brasi.

Before the "Lease Agreement" was executed, an unsuccessful bidder, Academic Village Foundation, Inc. (Academic), filed a bid protest notice with the Attorney General,[10] asserting that there had been unfair collusion between the university and Brasi, and that, since Brasi had previously obtained zoning changes permitting it to build a dormitory for the university, Brasi had an unfair advantage in bidding on the current project. The Foundation for Fair Contracting of Massachusetts filed a separate bid protest on the ground that the proposed dormitory

---

[8]Brasi Development Corp. (Brasi) was formed in 2005 specifically for the purpose of purchasing and developing a particular parcel of land in the city of Lowell (city) that is adjacent to the university's campus. Brasi acquired this parcel in 2006; in May, 2007, it obtained zoning permission from the city's planning board to develop the land as student housing. Although no agreement was finalized, Brasi had previously approached the university about a project to develop on the parcel a different type of dormitory than the one at issue in this case.

[9]One of the three Brasi partners was certified by DCAM as the head of another construction company.

[10]See G. L. c. 149, § 44H (Attorney General "require[s] compliance" with competitive bidding statute and may initiate proceedings in Superior Court to restrain award or performance of contracts found to be in violation of its provisions). See also part 2, *infra.*

was not a lease, but rather a project to construct a public building, and that the bidding process had failed to comply with the competitive bidding statute.

Brasi and the university signed the "Lease Agreement" while a decision on the bid protests was pending. Following an investigation and a bid protest hearing, see G. L. c. 149, § 44H, the Attorney General issued a combined decision on both protests, concluding that the university's RFP was a proposal to construct a public building, subject to the competitive bidding statute, and that the agreement between Brasi and the university was entered into in violation of those laws.[11] In reliance on the Attorney General's bid protest decision, the university attempted to terminate its contract with Brasi.[12]

Brasi filed an action against the university and the Attorney General in the Superior Court, seeking a judgment declaring that the bid protest decision was incorrect and that the provisions of the competitive bidding statute were not applicable to the lease agreement. The Attorney General counterclaimed, asserting that the bid protest decision should be upheld.

The university moved successfully to dismiss on the ground that the plaintiff sought no relief from the university. Brasi and the Attorney General filed cross motions for summary judgment. Concluding that the agreement between Brasi and the university was a lease for a newly-constructed building rather than an agreement to construct a building, and therefore was not subject to the competitive bidding statute, a judge in the Superior Court allowed Brasi's motion for summary judgment and ordered entry of judgment accordingly. We granted the Attorney General's request for direct appellate review.[13]

---

[11]As part of her findings of fact, the Attorney General concluded that Brasi's bid was not the lowest one submitted; this finding appears to have been based on the amount of the lease payment for the first year of the five-year lease. The finding is disputed by both Brasi and the university; both contend that the proposal of Academic Village Foundation, Inc., which the Attorney General found to be the lowest bid, was nonresponsive because it failed to meet the scheduling requirements in the RFP, and also that it would have resulted in annual costs to students that would have been almost twice as much per student as Brasi's proposal.

[12]Brasi disagreed, claiming that the university had no grounds on which to cancel the contract.

[13]Although the university canceled its contract with Brasi after the Attorney

2. *Statutory requirements.* Because the issue here is whether the university's resident housing project was subject to the competitive bidding statute, and because the university's acquisition or lease of real property is subject to the requirements of other statutes, we discuss the relevant portions of these statutes in some detail.

The competitive bidding statute sets forth detailed procedures governing the process that State agencies must follow in soliciting and accepting proposals for public construction projects. Pursuant to G. L. c. 149, § 44A (2) (D), "[e]very contract for the construction, reconstruction, installation, demolition, maintenance or repair of any building by a public agency estimated to cost more than $100,000, except for a pumping station . . . , shall be awarded to the lowest responsible and eligible general bidder on the basis of competitive bids in accordance with the procedure set forth in sections 44A to 44H, inclusive."[14]

The competitive bidding statute was substantially modified in 1980 in response to the findings of the Special Commission Concerning State and County Buildings (Ward Commission) that public construction projects in the Commonwealth were plagued by rampant favoritism in awarding bids and "shoddy" construction practices. See St. 1980, c. 579; St. 2004, c. 193; *LeClair* v. *Norwell*, 430 Mass. 328, 332 (1999); Final Report to the General Court of the Special Commission Concerning State

General issued her bid protest decision, the parties agree that the case is not moot. Both Brasi, in its briefs before this court, and the university, in earlier filings, state that, should the Attorney General's decision be reversed, they would "be in a position to address any remaining issues with respect to the lease agreement" and contend that the question is therefore not moot. See *Singer Friedlander Corp.* v. *State Lottery Comm'n*, 423 Mass. 562, 563 (1996). In any event, given the university's continuing and pressing need for student housing, the question is likely to arise again. See *Allen* v. *Boston Redev. Auth.*, 450 Mass 242, 254 n.20 (2007). Moreover, the issue is of significant public importance, is generally capable of repetition, and has been well briefed before this court. See *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 783 (1984).

[14] The statute was amended in 2004 to increase the estimated costs of projects subject to the provisions of G. L. c. 149, § 44A (2) (D), from $25,000 to $100,000. See St. 2004 c. 193, § 11 (2) (D). See also St. 1984, c. 484, § 44 (increasing limit from $5,000 to $25,000). In all other relevant respects, the statutory provisions applicable at the time of the events at issue here are unchanged.

and County Buildings, Vol. 1, 21-39 (Dec. 31, 1980) (Ward Commission Report). The purposes of the competitive bidding statute are to eliminate favoritism and corruption; to ensure an open and honest bidding process and an equal playing field for all bidders; and to ensure that qualified contractors build public buildings that are suitable for the uses for which they are intended. See *John T. Callahan & Sons, Inc.* v. *Malden,* 430 Mass. 124, 128 (1999), quoting *Modern Cont. Constr. Co.* v. *Lowell,* 391 Mass. 829, 840 (1984), and *James J. Welch & Co.* v. *Deputy Comm'r of Capital Planning & Operations,* 387 Mass. 662, 666 (1982). See also St. 1980, c. 579, preamble; Ward Commission Report at 29-30. The statute is designed to safeguard public funds by preventing unqualified contractors from working on public buildings; providing the awarding authority the most favorable price consistent with satisfactory construction; and reducing the risk that construction projects will not be completed. See St. 1980, c. 579, preamble; *Annese Elec. Servs., Inc.* v. *Newton,* 431 Mass. 763, 767 (2000). See also *Modern Cont. Constr. Co.* v. *Lowell, supra.*

The competitive bidding statute sets forth stringent requirements for precertification of contractors to assure that bidders will be able to complete the proposed project in terms both of their professional experience and their financial circumstances. See G. L. c. 149, § 44D (2), (3); 810 Code Mass. Regs. § 8.03 (2005). Where a construction project is estimated to exceed $10 million, additional precertification requirements apply. See G. L. c. 149, § 44D½. Only contractors who are precertified for the amount of a given project are considered "responsible"[15] public bidders "eligible"[16] to submit bids for construction projects. See G. L. c. 149, §§ 44A, 44D. DCAM has supervisory authority over State construction contracts, see G. L. c. 7, §§ 39A,

---

[15] " 'Responsible' means demonstrably possessing the skill, ability and integrity necessary to faithfully perform the work called for by a particular contract, based on a determination of competent workmanship and financial soundness in accordance with the provisions of section forty-four D of this chapter." G. L. c. 149, § 44A (1).

[16] " 'Eligible' means [one who is] able to meet all requirements for bidders or offerors set forth in sections forty-four A through forty-four H of this chapter . . . and who shall certify that he is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed on the work." G. L. c. 149, § 44A (1).

39B, 39D, 40A, 40G, and certifies contractors as eligible public bidders. See G. L. c. 149, § 44D.

The Attorney General is charged with investigating allegations of violations of the competitive bidding statute and enforcing its provisions. Investigations of alleged violations are initiated when a "bid protest," alleging a violation of the competitive bidding statute, is filed with the fair labor and business practices unit of the Attorney General's office. After investigation and an evidentiary hearing, the Attorney General issues a "bid protest decision" allowing or denying the protest. If the Attorney General determines that a violation has occurred, she may bring an action in the Superior Court seeking to enjoin an agreement or otherwise to enforce a bid protest decision. See G. L. c. 149, §§ 27C (*a*), 44H. See also *Annese Elec. Servs., Inc.* v. *Newton, supra* at 771. Where an agreement is subject to the competitive bidding statute and the statutory requirements are not met, the agreement is invalid and unenforceable. See *Majestic Radiator Enclosure Co.* v. *County Comm'rs of Middlesex*, 397 Mass. 1002, 1003 (1986).

A State agency's acquisition of interests in real property, whether by lease or purchase, is regulated by the provisions of several other statutes. State entities are subject to stringent public notice and oversight requirements when entering into lease agreements. See G. L. c. 7, §§ 40G, 40H; G. L. c. 30B, § 16. DCAM has supervisory authority over all State rental agreements. See G. L. c. 7, §§ 39A, 39B, 40G. The office of the Inspector General is responsible for preventing "fraud, waste and abuse in the expenditure of public funds" on State "construction"[17] contracts either for lease or purchase. See G. L. c. 12A, §§ 1, 7.

The university is independently authorized to lease, purchase, and manage property. See G. L. c. 75, §§ 11, 12. Although the university is generally free from oversight by other State agencies, see St. 1960, c. 773, § 18, it is subject to the statutory provisions governing capital facility projects under DCAM, see G. L. c. 75, § 1,[18] as well as to the competitive bidding laws.

---

[17]For this purpose, "construction" is defined as "planning, acquiring, designing, building, altering, repairing, maintaining, servicing, improving, demolishing, equipping or furnishing any structure." See G. L. c. 12A, § 1.

[18]Pursuant to G. L. c. 75, § 1, "[i]n exercising such authority, responsibility, powers and duties [the board of trustees of the State university] shall not in the management of the affairs of the university be subject to, or superseded

See St. 1998, c. 319, § 15; G. L. c. 29, § 7E.[19] See also *Associated Subcontrs. of Mass., Inc.* v. *University of Mass. Bldg. Auth.*, 442 Mass. 159, 160 (2004).

   3. *Discussion.* The Attorney General contends that the agreement between Brasi and the university was a contract for construction of a public building. She argues that the university sought to construct, rather than lease, a building because the RFP sets forth "extraordinarily detailed" and "very specialized" design requirements that required a new, special-purpose building. See *Andrews* v. *Springfield,* 75 Mass. App. Ct. 678, 680-681, 683-684 (2009) (city's hiring of architect to produce detailed design documents that were part of RFP for animal shelter was factor in decision that RFP was subject to competitive bidding statute). The Attorney General relies most extensively on the degree of supervision and control that the university maintained over the construction process as indicating that Brasi was acting as the university's agent. She cites also the potential thirty-year length of the agreement and the specific conditions governing the university's occupancy of the property. The Attorney General argues that Brasi's building permit, obtained prior to the issuance of the RFP, see note 8, *supra,* indicates that the university intended indefinite use of the proposed dormitory, and that the highly "specialized" nature of the dormitory, in conjunction with the provisions of the building permit, meant that any change in use of the property would require substantial, time-consuming, and costly modifications.

   In addition, although the bid protest decision declined to address these issues, and the judge did not consider them in ruling on Brasi's action for a declaratory judgment, the Attorney General

---

by, any other state agency, board, bureau, commission, department or officer, except as provided in section 14A of chapter 6A [Executive Office of Education], sections thirty-eight A½ to forty-three I, inclusive, of chapter seven [capital facility projects under DCAM], chapter fifteen [Department of Education], chapter fifteen A [public education] or in this chapter."

   [19]Limited exceptions to the public bidding requirement are authorized in specific circumstances. For instance, the University of Massachusetts, acting through its building authority, is not subject to the competitive bidding statute where at least half of the funds for construction are from a nonpublic source, see St. 1998, c. 319, § 15, and courts may lease public or private buildings constructed to their needs where "the interest of the efficient and cost-effective administration of justice requires." See G. L. c. 29A, § 4. See also G. L. c. 7, § 41C.

argues that, based on the short time frame (fifteen months) between the date of acceptance of the bid and the required occupancy date, Brasi had an unfair advantage because it had previously obtained zoning approval to build a dormitory; she maintains that, for all practical purposes, there may have been no other bidder able to compete with Brasi since other bidders would be unable to obtain zoning approval to construct a dormitory in the required time frame. Lastly, the Attorney General argues that, pursuant to G. L. c. 149, § 44H, she is responsible for enforcing the competitive bidding statute, and we should therefore accord substantial deference to her decisions interpreting that statute.

Brasi asserts that the judge determined correctly that the university sought a true lease and not a disguised construction contract. Brasi contends that it owned the land, assumed all risks and costs of construction, and would have owned and maintained the newly-built facility. While the university was responsible for fixed lease payments, Brasi was required to pay taxes, utilities and other costs, and assumed as well the risk of damage or destruction of the building; any damage to the building not repaired within 150 days would allow the university to cancel the lease. Brasi was required to maintain liability insurance on the property, to assume all liability for injuries incurred by residents and visitors to the premises, and to indemnify the university for any such injuries.

In addition, Brasi argues that the developer was responsible for the costs of maintenance and repair of the property, as well as the day-to-day operation and cleaning of the building and grounds. Brasi states there was no unfair competition, and there is no basis in the record for the Attorney General's finding that the university will most likely seek to acquire the facility at the end of the lease. Finally, Brasi contends that the Attorney General does not have the type of discretionary rule-making authority under G. L. c. 149, § 44H, that would entitle her interpretation of the public bidding statute to deference. See *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. 763, 771 (2000).

a. *Standard of review.* Ordinarily, we review a question of statutory interpretation de novo. See *Costa* v. *Fall River Hous. Auth.*, 453 Mass. 614, 620 (2009), citing *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006). The Attorney

General has no rule-making authority with respect to the competitive bidding statute and no broad discretion in issuing enforcement decisions. Contrast *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233, 239-240 (2001), and *American Family Life Assur. Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 471, 474-475, cert. denied, 464 U.S. 850 (1983). The competitive bidding statute sets forth detailed criteria concerning virtually every aspect of the bidding process and the manner in which it is to be conducted, and the Attorney General has authority only to "require compliance" with its terms if, "after investigation of the facts, [s]he has made a finding that [a bid] award or performance has resulted in violation" of the statutory provisions. See G. L. c. 149, § 44H. Because the decision involves neither an adjudicatory proceeding nor rule making, we conclude, as we did in similar circumstances in *Annese Elec. Servs., Inc.* v. *Newton, supra,* that the Attorney General's decision interpreting the competitive bidding statute should be accorded no deference.

b. *Whether the competitive bidding statute is applicable to requests for long-term lease agreements.* "We construe [the competitive bidding statute], as we must, in light of the legislative objectives which were served by its enactment so as to effectuate the purpose of the framers." *John T. Callahan & Sons, Inc.* v. *Malden*, 430 Mass. 124, 128 (1999), quoting *Interstate Eng'g Corp.* v. *Fitchburg*, 367 Mass. 751, 757 (1975). Consistent with its broad remedial purpose, the competitive bidding statute is to be strictly construed. See *Modern Cont. Constr. Co.* v. *Lowell*, 391 Mass. 829, 840 (1984).

The judge decided that the lease agreement between Brasi and the university was not "the functional equivalent of a construction contract" because Brasi retained ownership of the land and the building, assumed the risks and costs of construction, and assumed also the costs of ownership of the finished dormitory. The judge concluded that:

> "Although the student housing project at issue clearly contemplated construction activities, [the university's] primary objective has always been to lease a student housing facility. All costs associated with the construction of the facility are to be paid by Brasi. [The university's] obligation to pay rent, on the other hand, is unrelated to

the costs of construction, and does not commence until the date of occupancy. Brasi has retained ownership of the property and bears all risks associated therewith, including the risk of casualty loss and the obligation to maintain the property in good repair."

Thus, the judge determined that the agreement was not subject to the competitive bidding statute.

The Legislature has provided no guidance for distinguishing a lease by a public agency from a construction contract subject to the competitive bidding statute, and we have had little opportunity to construe the competitive bidding statute in this respect. Therefore, we look more generally to our decisions regarding other statutes requiring public bidding. See *Modern Cont. Constr. Co.* v. *Lowell, supra* at 836 n.9, citing *Datatrol Inc.* v. *State Purch. Agent,* 379 Mass. 679, 690 (1980); *Modern Cont. Constr. Co.* v. *Lowell, supra* at 840. See also *Andrews* v. *Springfield,* 75 Mass. App. Ct. 678, 684 (2009), citing *Datatrol Inc.* v. *State Purch. Agent, supra* at 695-696.

We have concluded previously that other statutes requiring competitive public bidding may be broad enough to encompass long-term leases. See *Datatrol Inc.* v. *State Purch. Agent, supra* at 688 n.7, 695 (agreement to lease computer system for State lottery, where agency retained option to purchase equipment at end of lease period, was actually agreement to purchase equipment and was therefore subject to general procurement statute, G. L. c. 7, § 22). In that case, we determined that, because the general procurement statute applies to both purchases and to agreements "contracting for . . . equipment," it is broad enough to include a lease. See *id.* Otherwise, the parties could easily employ long-term leases to evade the "competitive bidding requirement" of the procurement statute. *Id.* at 695-696. In addition, the Appeals Court has recently decided that an agreement described as a long-term lease of an animal control center was in essence a contract for construction of a public building, and therefore that public bidding on the project was required pursuant to the provisions of the competitive bidding statute. See *Andrews* v. *Springfield, supra* at 683-685.

We agree with the Appeals Court that a contract for a long-term lease may, in some circumstances, be subject to the require-

ments of the competitive bidding statute. The statute, which is to be strictly construed, applies to construction "of any building by a public agency," without limitation to buildings that will be owned by the Commonwealth. See G. L. c. 149, § 44A (2) (D). Exempting agreements labeled "leases" that are intended clearly to create buildings for long-term use by public agencies defeats the purposes of the competitive bidding statute. The issue before us, then, is to define those circumstances.

c. *Test to determine when a lease agreement is subject to the competitive bidding statute.* A determination whether a project is construction "of any building by a public agency" is fact specific and cannot be based on any single factor. In the context of other public bidding statutes in the Commonwealth, the use of public funds, the length of the agreement, the use of private contractors or construction on private land, and whether relatively minor renovations are required that nonetheless exceed a statutory limit for construction projects have not been determinative. See *Norfolk Elec., Inc.* v. *Fall River Hous. Auth.*, 417 Mass. 207, 208-209, 213-214, 216 n.8 (1994) (renovation of low income housing project with Federal funds was subject to State public bidding law where State agency had "day-to-day control" of operation); *Helmes* v. *Commonwealth*, 406 Mass. 873, 874, 876-877 (1990) (public procurement statute did not apply because charity was not acting as agent of Commonwealth); *Salem Bldg. Supply Co.* v. *J.B.L. Constr. Co.*, 10 Mass. App. Ct. 360, 361-362 (1980) (private development of apartment complex for low income residents not construction of public building subject to G. L. c. 149, § 29, because housing agency only provided financing and developer retained control of project).

Without explicitly setting forth a new test, the Appeals Court relied on a multifactor analysis in reaching its determination that the city of Springfield's (Springfield's) long-term lease agreement for construction of an animal shelter was actually construction of a building by a State agency that was subject to the competitive bidding statute. See *Andrews* v. *Springfield, supra* at 683-684. In that case, Springfield entered into a twenty-five year lease with a private firm to build the animal shelter according to Springfield's specifications. *Id.* at 681. The Appeals Court

examined the character of the RFP that Springfield issued to determine if the competitive bidding statute applied. *Id.* at 683.

As significant factors supporting its decision that the lease agreement was subject to the competitive bidding statute, the Appeals Court emphasized the length of the lease; the detailed design and construction requirements that Springfield set forth; the degree of Springfield's control over the construction process; and the fact that the lease payments were more than the costs of constructing the building. See *id.* at 682-684. Primary factors in the analysis were that, as stated in the RFP, Springfield intended to acquire an animal shelter for long-term use, and retained an option to purchase the facility for one dollar at the end of the lease, thereby obtaining the facility through lease payments using public funds. *Id.* at 683. Additionally, the Appeals Court observed that its holding was consistent with the statutory language applying to "[e]very contract for the construction . . . of any building by a public agency," and that to allow Springfield to evade the competitive bidding laws by styling a construction contract as a lease agreement was contrary to the statutory purpose. *Id.* at 684-685.

We agree with the analysis of the Appeals Court in *Andrews* v. *Springfield*, *supra* at 683-685, and with the factors it considered. We conclude that no specific set of factors will be sufficient for every situation, and that a totality of the circumstances test, which examines the circumstances in each case in detail, is the best approach for determining whether "build to lease" agreements are subject to the competitive bidding statute. Factors that may be helpful, but not dispositive, in determining whether a project is subject to the competitive bidding statute include the extent of control retained by the agency during development and construction; the length of the proposed lease, including any proposed extensions; whether the source of money is public funds; whether payments made under the agreement essentially cover the costs of construction; whether the State agency retains an option to purchase for a nominal sum at the end of the lease period or whether the building automatically transfers to the public agency on expiration of the lease; whether the agency initially owned the land and then sold or leased it to the private party, or whether the agency had the building constructed and then leased the newly constructed building; and whether the facility is of a

specialized nature that would render it unsuitable for another commercial purpose without significant renovations.[20]

d. *Nature of the university's agreement with Brasi.* In granting summary judgment on Brasi's declaratory judgment action, the judge declared, in our view erroneously, that the contract between Brasi and the university was "for the lease of a completed student dormitory, rather than the construction of a building by a public agency." Although the factors the judge considered in reaching her decision were appropriate, her conclusion that the project was not construction of a building by a public agency was error. Applying the multifactor analysis discussed in part 3.c, *supra*, and considering all the circumstances in this case, we conclude that the lease agreement was subject to the competitive bidding statute.

The competitive bidding statute governs all construction "of a building by a public agency." G. L. c. 149, § 44A (2) (D). It is to be strictly construed to effect its remedial purposes. See *Modern Cont. Constr. Co.* v. *Lowell,* 391 Mass. 829, 840 (1984). The statute does not distinguish between buildings that a public agency will own and buildings that a public agency will lease. Rather, it focuses on the creation of a project by the agency for the agency's use in carrying out its public purposes.

Were we to consider only the character of the RFP, as has been done in other contexts, see *Datatrol Inc.* v. *State Purch. Agent,* 379 Mass. 679, 695 (1980); *Andrews* v. *Springfield,* 75 Mass. App. Ct. 678, 683 (2009),[21] we would agree with Brasi that

---

[20]Courts in other jurisdictions that have considered this issue have also applied a fact-specific, multifactor test. See, e.g., *Division of Labor Standards* v. *Friends of the Zoo of Springfield,* 38 S.W.3d 421, 422-424 (Mo. 2001); *Webster* v. *Camdenton,* 779 S.W.2d 312, 313-314, 316-317 (Mo. Ct. App. 1989); *United States Corrections Corp.* v. *Department of Indus. Relations,* 73 Ohio St. 3d 210, 212, 217-220 (1995); *Celebrezze* v. *Tele-Communications, Inc.,* 62 Ohio Misc. 2d 405, 412-416, 419-424 (1990); *Mechanical Contrs. Ass'n* v. *University of Cincinnati,* 141 Ohio App. 3d 333, 335-336, 340 (2001); *Willman* v. *Children's Hosp.,* 505 Pa. 263, 270-271 (1984); *Affiliated Constr. Trades Found.* v. *University of W. Va. Bd. of Trustees,* 210 W. Va. 456, 469-472 (2001).

The Attorney General has cited the detailed multifactor test set forth by the Supreme Court of Appeals of West Virginia, see *Affiliated Constr. Trades Found.* v. *University of W. Va. Bd. of Trustees, supra,* in some of her bid protest decisions. See, e.g., Enlace de Familias de Holyoke/Holyoke Community Charter School, Bid Protest Decision (July 15, 2002), at 10-12.

[21]*Datatrol Inc.* v. *State Purch. Agent,* 379 Mass. 679, 695 (1980), concerned

the dormitory project was not subject to the competitive bidding statute. However, limiting the inquiry to the RFP ignores relevant circumstances that have a direct bearing on the transaction that the parties contemplated. In the context of this case, where the lease agreement was signed only three months after the bidder was selected, and significant terms were included in that agreement that were not included in the university's RFP, we must consider the provisions of both documents.

We recognize that contracts acceptable to a private bidder will necessarily differ in some respects from the terms of an RFP. We acknowledge also that, in certain circumstances, it will not be practical to review the terms of a contract that the parties may have executed long after the selection of a particular bidder. Here, however, the RFP was issued in February, 2008; the bidder was selected in May, 2008; and Brasi and the university executed the lease agreement on August 1, 2008, well before any construction had begun.

The agreement the university ultimately entered into with the selected bidder differs substantially in provisions that are critical to a determination whether the agreement was a contract for construction by a public agency. In situations such as the one here, considering only the RFP would defeat entirely the purposes of the competitive bidding statute. If agencies are permitted to issue an RFP that is not subject to the competitive bidding statute, yet then place in a subsequent agreement key terms that indicate that the agreement is in fact a construction contract, the objectives of the competitive bidding statute would easily be frustrated.

Ultimately, the residential housing project here involved creation of a new building, adjacent to the university's campus and dependent on the use of the university's parking lot, which the university had the right to occupy for thirty years. These facts persuade us that the dormitory project was indeed construction of a building by the university in the sense contemplated by the competitive bidding statute. Certain modified provisions are critical to our conclusion that the final agreement is one for

---

the general procurement statute (G. L. c. 7, § 22), not the competitive bidding statute. *Andrews* v. *Springfield,* 75 Mass. App. Ct. 678, 683 (2009), although evaluating the statute at issue here, relied on cases interpreting other public bidding statutes, notably *Datatrol Inc.* v. *State Purch. Agent, supra.*

construction of a residential housing facility, including the material change in the length of the agreement (doubling its length), and the increased degree of the university's supervision of the construction process from that in the RFP. We also deem critical several provisions that were added to the lease agreement that were not part of the RFP, particularly the facts that the new facility depends on other property already owned by the university, and that the university is granting Brasi an easement, apparently unlimited in duration, for use of university land.

We begin by examining the significant number of factors in the RFP establishing that the project proposed in the RFP itself was not subject to the competitive bidding statute. Then we consider deviations from the RFP that were made in the final agreement between Brasi and the university which rendered it a contract for construction by the university subject to the competitive bidding statute.

Standing alone, the RFP sought the use of land and buildings owned and maintained by proposed bidders and did not involve university property. Although the RFP initially required an option to purchase if the proposed bidder chose to sell the property during the lease term, that requirement was eliminated at a prebid conference where an amended RFP was issued. The sample lease attached to the RFP, as well as the agreement eventually executed with Brasi, required that the university relinquish possession on termination of the agreement.[22]

The length of the lease term set forth in the RFP was consistent with the university's assertion that it intended a short-term

[22]In seeking reconsideration of the bid protest decision, the university submitted documents asserting that the RFP contemplated a short-term lease to meet immediate needs while the university developed long-term plans to double its student housing by new construction on its existing campus that would include other facilities as well. The university stated that it was working with its building authority, see G. L. c. 75, §§ 1-2, to develop an over-all site plan encompassing the three separate parcels of land that constitute the university's campus and to generate adequate funds; that this was a well-documented public project; and that the current chancellor was selected in part because of his commitment to this development. The Attorney General does not dispute these assertions. Moreover, in another bid protest decision, the Attorney General has relied on an agency's plans for separate long-term development as indicating that a shorter-term lease was not construction subject to the competitive bidding laws. See Town of Hadley, Trial Court Leasing Project, Bid Protest Decision (January 31, 2003), at 7, 9.

occupancy. Not only was the lease period in the RFP of relatively short duration (five years, with options for two five-year extensions), the RFP placed all risk of nonrenewal on the lessor. If a bidder responded with a proposal to construct a building, that bidder would have no assurance of recouping its construction costs during the initial five-year term of the lease, and would be certain of the university's occupancy for no more than five years. Indeed, Brasi's proposal indicated that it would have incurred at least $25 million in construction costs (in addition to the cost of acquisition of the property) before the university was required to make any lease payments, and that the university would have guaranteed to pay only $8 million towards those costs.[23] Furthermore, we note that DCAM's standard lease agreement is for a five-year term with options to renew at the discretion of the lessee. See Town of Hadley, Trial Court Leasing Project, Bid Protest Decision (January 31, 2003), at 2.

We turn next to the type of building required by the university. The RFP sought a residential facility containing a mixture of one- and two-bedroom apartments to house 120 to 400 students. It required a minimum of ninety to one hundred square feet per student in each bedroom and one two-bedroom apartment for a resident director for each 250 students. It stated also that the facility should not "conflict with" the university's or the city's architecture, and should be "attractive to college students."

As is evident from the responses received by the university, a new building clearly was not required under the terms of the RFP. After reviewing the RFP at the university's request to determine the zoning approvals that would be needed, a city manager concluded that existing multifamily residential buildings could be used to satisfy the RFP without any change in zoning or additional permits. The city manager's letter of opinion was distributed to all potential bidders. In fact, four of the seven proposals submitted in response to the RFP were for the use of

---

[23]Based on documents in Brasi's proposal, in addition to the purchase costs of the property, it would have entered into a $22.5 million bank loan to construct the building, and would have paid over $1 million annually in taxes, insurance, and maintenance costs, while the university was obligated to pay only $2.6 million annually (including costs for utilities, telephone service, cable television, snow removal, and daily cleaning) for no more than a five-year period and only after the building was useable.

existing structures, and two of those proposed structures were to be used without any modifications. The judge observed correctly: "It bears noting that if Brasi had already completed construction of the facility, the substance of the parties' agreement would remain the same. A fully constructed facility would equally qualify for consideration under the RFP, as would a proposal to modify an existing structure. . . ."

The record indicates also that the building described in Brasi's proposal, to which Brasi's earlier permit would apply according to the city manager's letter, could readily have been used as an ordinary apartment building at the end of the lease term. The permit issued to Brasi allowed a "dormitory" use of the property.[24] Under the city's zoning code, a "dormitory" use of a multifamily building differs only in that the city-wide restriction of no more than three unrelated individuals living in any one apartment unit does not apply (i.e., a two-bedroom apartment in a "dormitory" can house four students, whereas the same apartment can house only three students in a "multi-family" unit).[25] Thus, Brasi would have had an economically viable use of the building after the expiration of the lease term contemplated in the RFP. This factor weighs in favor of a conclusion that the agreement was not subject to the competitive bidding laws.

---

[24] The permit required Brasi to enter into a thirty-year lease with the university and to seek zoning board approval before converting the building to any other use. In its motion to reconsider, the university stated both its belief that this condition was invalid and unenforceable and its understanding that the condition had subsequently been removed from the permit.

[25] The city manager's zoning opinion letter, attached to the RFP, explained also that in the "institutional" zone, where dormitory use is allowed as of right, no zoning approvals would be required. Obtaining a special permit (new or existing building) or site plan approval (new building) for a "dormitory" use in the numerous zones where such uses were permissible would take three to four months. Obtaining a zoning change for a dormitory use in a zone where a dormitory use was not permitted would generally take from four to six months. Thus, the city manager's zoning opinion letter does not support the Attorney General's assertion that no other bidders would be able to compete effectively with Brasi, given the eighteen-month period from issuance of the RFP to the occupancy date, because Brasi had an existing special permit. In addition, as long as all bidders are responding to the same set of requirements, and evaluated by the same set of criteria, the process is fair. That some bidders have advantages in experience, financial strength, or available resources does not infringe on the purpose of the competitive bidding law to allow all to compete on an equal footing. See *Department of Labor & Indus.* v. *Boston Water & Sewer Comm'n*, 18 Mass. App. Ct. 621, 626 (1984).

Next, we consider the degree of the university's control over the design requirements. We conclude that the university did not retain significant control of the design specifications in the RFP. Bidders responded to a set of basic requirements for a student residential housing facility consisting of one- and two-bedroom apartments. See *J.F. White Contr. Co.* v. *Massachusetts Port Auth.*, 51 Mass. App. Ct. 811, 816 (2001). The RFP required bidders to submit documents and specifications showing the design and floor plans of the building or buildings, and stated that the university would evaluate all proposals for attractiveness of design, quality of materials, durability, and cost.

Unlike the very specialized requirements for construction of an animal shelter discussed in *Andrews* v. *Springfield*, 75 Mass. App. Ct. 678, 683 (2009), nothing in the university's RFP indicates the "extraordinary" level of specialized design suggested by the Attorney General. To the contrary, many of the requirements are basic and standard for any multifamily residential housing. For instance, the requirements of a window and a closet in each bedroom, peepholes in apartment doors, mail boxes meeting United States Post Office standards in the entry area, and compliance with Federal accessibility requirements for disabled individuals are common and would generally be mandated by provisions of the city zoning code and Federal law.

Certain provisions for electrical systems and security features were peculiar to the university. In separate schedules, the RFP contained requirements for Internet, telephone, and cable television access in each room, and security features, including video cameras at outside entrances, capable of connecting to the university's computer network. However, as the bid protest decision observed, the fact that an agreement contemplates some level of customization or "build out" of leased space is "common" in commercial leases, and tenants' involvement in this process does not convert a lease into a construction agreement. See, for example, the following bid protest decisions: Four Rivers Charter School, School Construction Project, Bid Protest Decision (September 24, 2004); Pioneer Valley Performing Arts School, Bid Protest Decision (April 20, 2004); Town of Hadley, Trial Court Leasing Project, Bid Protest Decision (January 31, 2003). Contrast *Andrews* v. *Springfield, supra* at 680-681, 683-684 (city controlled design specifications where city

hired architect to develop detailed design and construction documents, attached them to RFP, and required all bidders to comply with those specifications; specifications included location of over eighty-five rooms in building, required finishes for all surfaces, descriptions of tiles, flooring, and paint, and specific manufacturers and model numbers for fixtures and fittings).

Thus, the terms of the RFP, viewed in isolation, indicate that the university's dormitory project contemplated the leasing of a building that might or might not already exist; was not a construction project; and therefore was not subject to the competitive bidding statute. However, that is not the end of the inquiry. As stated, several significant provisions in the RFP were materially altered in the lease agreement. The modified provisions in the final agreement contrast markedly with important terms of the RFP and change the character of the project. In addition, the lease agreement contained several provisions that formed no part of the RFP and which indicate an intention by the university to exercise long-term control of the dormitory.[26]

First, while the RFP sought an initial five-year lease period, with an option to extend by the university for two additional five-year terms, the agreement ultimately executed between Brasi and the university provided for a maximum of a thirty-year lease; it included an initial five-year lease period, with automatic renewal of the lease for two additional five-year periods (rent to be negotiated), and then an option on the part of the university to renew for up to three additional five-year terms. The contractual provision allowing the university to use the dormitory for thirty years supports a conclusion that the university intended to acquire the facility or at least to retain effective permanent control thereof. In any event, the guaranteed fifteen-year period of the lease, with extensions totaling another fifteen years, is substantially different from that described in the RFP; thus, the provision suggests that the requirements set forth in the RFP did not reflect the university's true purpose.

In addition, the agreement eventually negotiated by the parties provided for the construction by Brasi of an entirely new building. While creation of a new structure is not determinative,

---

[26]These provisions support an inference that the university will eventually seek to acquire the facility, although our conclusion does not depend on this assumption.

see, e.g., Town of Hadley, Trial Court Leasing Project, Bid Protest Decision (January 31, 2003), it is a factor that is entitled to weight in this case, in conjunction with other factors such as the length of the lease, in deciding whether there is construction "of a building by a public agency."

The degree of supervision and control that the university maintained over the construction process is also a meaningful factor here. This factor was relied on extensively by the Attorney General as evidence that Brasi was acting as the university's agent. The RFP stated that the successful bidder would be responsible for managing the project and maintaining liability insurance. It provided only that the university would have approval of the architectural design and the construction materials, and does not tend to indicate university control over the day-to-day construction. The lease agreement, however, provided the university significantly greater control and approval over the construction process. Most particularly, the university had the right to attend weekly construction meetings and to approve various phases of the work.

The judge considered the terms of the lease agreement, and determined that the university's right to attend weekly meetings and approve various phases of construction represented only "limited participation in the construction process" and that "monitoring the building's development is the only practical means of safeguarding the [u]niversity's interests." However, in our view, the agreement's provisions allowed more than "limited" participation in the construction process. The lease agreement allowed the university to exercise supervisory authority and approval at least over major phases of the construction, and to have an ongoing role in monitoring the building process. Thus, the university retained substantially greater supervision over construction than was described in the RFP. The level of supervision afforded the university is similar in kind to the city of Springfield's right to hire a "construction·manager to inspect and approve each phase of the construction," see *Andrews* v. *Springfield, supra* at 681.

Thus, it is apparent that the parties' ultimate agreement departed in material respects from what appeared in the RFP. What started as a relatively short-term occupancy of a building that might already exist ended as a potentially long-term com-

mitment to a new structure over which the university would exercise considerable influence.

Other terms in the agreement that were not part of the RFP provide additional indications that the agreement contemplated construction of a dormitory by the university in the sense embraced by the competitive bidding statute. Importantly, the lease agreement would have resulted in creation of a building that was dependent on the continuing use of university land. As stated, Brasi had obtained previously a zoning permit for the never-undertaken dormitory project that Brasi had proposed to the university. That permit had a provision stating that parking for the proposed dormitory would be in one of the parking lots on the university's campus, because Brasi's property was not large enough to contain a parking lot of the size necessary to meet city zoning requirements for the ratio of parking spaces to student beds.

The RFP required that bidders proposing development describe their plans for obtaining approval from the city. In response, Brasi submitted the permit it had obtained previously and a letter from the city stating that the earlier permit could be used for the dormitory sought in the RFP. Both the permit and the university's acceptance of the permit requirements were incorporated in the terms of the lease agreement. The lease provided that the university agreed to the use of its parking lot for dormitory parking. Thus, the lease agreement would have resulted in Brasi owning a building that was dependent on the indefinite use of university land in order to comply with the requirements of Brasi's building permit.

Furthermore, to alleviate its concerns over the proximity of Brasi's property to a commuter rail line, in its conditional acceptance letter the university required Brasi to build, at no additional cost to the university, a climate controlled and handicapped accessible pedestrian bridge over the tracks as well as a twelve-foot fence along Brasi's property line abutting the railroad property. The university agreed also that, to facilitate placement of the pedestrian bridge, it would grant Brasi an easement over a portion of the university parking lot. These conditions, including the university's commitment to grant Brasi such an easement, were incorporated in the lease agreement. Thus, the lease agreement

transferred to Brasi an interest in a portion of the university campus and permitted Brasi an indefinite use of another portion.

The additional provisions in the lease concerning construction of the pedestrian bridge on a portion of the university's parking lot, and use of the university's existing parking lot to meet zoning requirements for dormitory parking, suggest that the university intends indefinite use of the proposed dormitory and eventually to incorporate the dormitory into the university campus. Given the university's acknowledged urgent need for student housing, such a conclusion is not inconsistent with the university's stated intention of doubling the capacity of the dormitory facilities on its existing property.

The Attorney General makes several arguments regarding financial factors that have been significant to determinations made in other cases. However, because the record does not contain adequate information to support these arguments, we are unable to evaluate these factors in this case. Therefore, although such financial factors could have an impact on a determination whether the agreement was a lease or a contract for construction, we reach no conclusion on these matters.

Considering all the provisions of the RFP and the lease agreement in this case, including the relevant changes that we have identified, we conclude that the university's agreement with Brasi was subject to the competitive bidding statute. Therefore, we conclude that the lease agreement was for construction of a dormitory by the university, and was entered into in violation of the competitive bidding statute.

*4. Conclusion.* The competitive bidding statute, G. L. c. 149, §§ 44A-44H, is applicable to the university's agreement with Brasi to develop and maintain a student dormitory near its campus. The judgment of the Superior Court is reversed, and a declaration in accordance with this opinion shall be entered.

*So ordered.*